**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **LAUDES CORPORATION,** <br> *Plaintiff,* <br> v. <br> **THE UNITED STATES,** <br> *Defendant.* | No. 08-121 C |

FILED
FEB 29 2008
U.S. COURT OF FEDERAL CLAIMS

**COMPLAINT**

Pursuant to Rules 3 and 7 of the Rules of the United States Court of Federal Claims, Plaintiff Laudes Corporation ("Laudes"), as and for its complaint against the Defendant, United States of America, hereby respectfully requests the relief against Defendant prayed for below, and in support thereof, states as follows:

## I. *PARTIES*

1. Plaintiff is Laudes, a Delaware corporation with its principal place of business in North Carolina.

2. Defendant is the United States, acting by and through its authorized agents.

## II. *JURISDICTION AND VENUE*

3. This Court has jurisdiction over this action for breach of an implied-in-fact contract pursuant to the Tucker Act, Section 1491(a) of title 28 of the United States Code.

4. Venue over this original action for Defendant's breach of contract lies properly in this Court.

## III. *PERTINENT FACTS*

### A. *STATUS OF U.S. GOVERNMENT AND PROJECT AND CONTRACTING OFFICE IN IRAQ IN LATE 2004*

5. In March 2003, the United States invaded Iraq, deposed Saddam Hussein from power and became an occupying power over Iraqi territory under the law of war in accordance with the Hague and Geneva Conventions.

6. In early May 2003, the United States announced the creation of the Coalition Provisional Authority (CPA). According to President Bush, the CPA was created under the law of war to exercise powers of the Iraqi government temporarily and to provide for security in Iraq. On May 6, 2003, President Bush, in an executive action, appointed Ambassador L. Paul Bremer to serve as the Presidential Envoy to Iraq and directed that Ambassador Bremer report to Secretary of Defense Donald Rumsfeld.

7. According to Ambassador Bremer's letter of appointment:

> Subject to the authority, direction, and control of the Secretary of Defense, you are authorized to oversee, direct, and coordinate all United States Government (USG) programs and activities in Iraq, except those under the command of the Commander, U.S. Central Command.

8. In a June 2003 report to Congress, the U.S. Office of Management and Budget described the duties of the Administrator and the CPA as follows:

> The administrator of the Coalition Provisional Authority (CPA) reports to the President through the Secretary of Defense. . . . The CPA is vested by the President with all executive, legislative and judicial authority necessary to achieve its objectives, exercised consistent with relevant U. N. Security Council resolutions.

Congress, in the fiscal year 2004 emergency supplemental appropriation stated that the CPA was "an entity of the United States Government."

9. On May 11, 2004, President Bush signed National Security Policy Directive 36 (NSPD-36), preparing to effect a transfer of some, but not all, of the CPA's authority and powers to an Interim Iraqi Government ("IIG"). The directive provided, in pertinent part:

> When the CPA is terminated, the United States will be represented in Iraq by a Chief of Mission, who on my behalf and under the guidance of the Secretary of State, shall be responsible for the direction, coordination and supervision of all United States Government employees, policies, and activities in country, except those under the command of an area military commander, and employees seconded to an International Organization. Commander, USCENTCOM [US Central Command], under the authority, direction, and control of the Secretary of Defense, shall continue to be responsible for U.S. efforts with respect to security and military operations in Iraq. . . .

> Commander, USCENTCOM, with the policy guidance of the Chief of Mission, shall direct all United States Government efforts and coordinate international efforts in support of organizing, equipping, and training all Iraqi security forces.

* * *

10. In order to implement NSPD-36, the US Department of Defense created the Multinational Security Transition Command-Iraq (MNSTC-I) under the overall direction of Commander, Multinational Force-Iraq (MNF-I).

11. Transfer of authority to the IIG on June 28, 2004, did not result in complete control of Iraq by the IIG. Nor was it intended to produce that result. By separate letters, both dated June 5, 2005, U.S. Secretary of State Colin Powell and Dr. Ayad Allawi, Prime Minister of the IIG, disclosed to the United Nations Security Council agreed upon limitations and/or exceptions to the IIG's authority over its territory and population.

12. Specifically, according to the agreement reflected in the Powell/Allawi letters, Iraqi security forces would fall under operational command of the MNF-I during military operations in order to achieve unity of command. Further, the MNF-I, under United States Government ("USG") command and control, undertook a broad range of tasks to contribute to the maintenance of security, to ensure force protection, and to train and equip Iraqi security forces.

13. On June 8, 2004, the United Nations Security Council issued Resolution 1546 which, among other things, declared that the MNF "shall have the authority to take all necessary measures to contribute to the maintenance of security and stability in Iraq in accordance with the [letters from Secretary Powell and Prime Minister Allawi] annexed to this resolution…."

14. In furtherance of MNF-I's core mission, President Bush in NSPD-36 further provided:

> I also establish . . . a temporary organization within the Department of Defense to be called the Project and Contracting office (PCO) to provide acquisition and project management support with respect to activities in Iraq, as requested by the Secretary of State and heads of other Departments and agencies. The Secretary of

> Defense in consultation with the Secretary of State shall select a Director for PCO. PCO personnel in Iraq shall be permanently or temporarily assigned under Chief of Mission authority. PCO shall provide acquisition and project management support to the Chief of Mission. . . . The Director of the Office of Management and Budget shall ensure that future budget submissions request the funding and authorities I determine necessary to support the U.S. Mission in Iraq.

15. From and after September 2004, and at all times relevant hereto, the PCO was an organization within the United States Department of Defense, and the contracting authority of MNSTC-I and MFN-I, tasked to provide acquisition and project management support. The PCO was staffed by U.S. Government officials, both military and civilian. The civilian and military contracting officers within the PCO were, at all times relevant hereto, authorized agents of the Defendant, United States Government.

**B.** ***THE FALLUJAH CONTRACT***

16. In or around October 2004, the MNF-I believed that the city of Fallujah, about 70 km to the west of Baghdad, in the heart of what is known as the "Sunni Triangle," where the population was more hostile to the USG occupation than other parts of the country, had become a haven for terrorists staging attacks on MNF-I forces. Fallujah gained notoriety in March 2004 when terrorists attacked a convoy of trucks driven by contractor personnel, killed the drivers and mutilated their bodies and displayed the bodies prominently. The incident received considerable media attention.

17. In October 2004, the USG began the final preparations for what would become known as the Second Battle of Fallujah and was officially named "Operation Phantom Fury." The goal of the operation was to extricate terrorists from Fallujah. MNF-I forces believed that the insurgent leader, Abu Musad Al-Zarqawi, and thousands of his fighters had taken refuge within the city.

18. For political, as much as operational reasons, the USG wanted Iraqi forces to play a role in the battle to retake Fallujah. Iraqi Security Forces ("ISF") were to support United States Marine Corps forces, known as a Marine Expeditionary Force ("MEF") in the fighting under the command of a Marine Corps general officer. The plan was for the ISF to take over security of

the city at the conclusion of the operation.

19. However, the ISF was not capable of functioning independently. The ISF had virtually no logistics capability to sustain or support its soldiers' participation in the planned operation.

20. In or about mid-October, 2004, Lieutenant Colonel Mark Hobson, of the PCO, began working with Colonel David Saul, Chief of Strategic Plans, MNF-I, to define contract specifications for the provision of accommodations, related infrastructure, and life support services, to be delivered at a forward operating base near Fallujah, to support the participation of the ISF in the Fallujah operation. Neither the IIG, Ministry of Defence nor the ISF were involved in the process of defining these contract specifications.

21. Eventually, on or about October 19, 2004, Colonels Hobson and Saul agreed on a Statement of Work ("SOW") for a contract that eventually became known as the East Fallujah Iraqi Camp, and referred to by the acronym, "EFIC."

22. Laudes performed under a number of contracts in support of USG military operations and reconstruction efforts in Iraq from 2003 through 2005. Laudes provided essential support to the USG's efforts to stabilize Iraq in the midst of a growing insurgency. For example, it built temporary structures at the Baghdad Police Services Academy ("BPSA") and it provided life support services for Iraqi police trainees there, as well as providing similar services at a number of Forward Operating Bases ("FOBs"). In this work, Laudes built and sustained military camps. This involved building and maintaining living quarters, dining facilities, toilets and showers oftentimes from a "bare base" or near "bare base" starting point requiring implementation of electrical generators and systems for providing water and fuel as well as for providing for security.

23. Operating conditions in Iraq during 2004 were extremely difficult. In addition, requirements changed almost daily as dictated by the mission, policies and as the security status changed and evolved. Nevertheless, Laudes provided results for the MFN-I and gained a reputation within the PCO as the "go to" contractor for life support services in Iraq.

24. Mr. T.J. McLaren, Senior Contracts Administrator, PCO Contracts Activity, acting for and on behalf of the PCO, requested that Laudes submit a proposal meeting the requirements EFIC SOW developed by PCO. Mr. McLaren's actions in this regard were undertaken with the knowledge, and under the direction and control, of Lieutenant Colonel Mark Hobson of the PCO.

25. On October 19, 2004, at 7:35 am, Baghdad time, Mr. McLaren sent an email to Laudes informing it of the general nature of the requirements of "the Government" and asking Laudes to submit a "ROM" or Rough Order of Magnitude by 12:00 pm that same day. The rushed nature of the contract formation underscores the importance the PCO put on this contract. In an email from LTC Hobson to COL Saul, LTC Hobson described the EFIC contract as "our number one priority."

26. In this email, Mr. McLaren never mentioned that the contract would be with the MOD or any other instrumentality of the IIG. In fact, every indication in the e-mail is that the contract was solicited by the PCO and the PCO alone.

27. The next day, on October 20, 2004 at 11:05 am, Mr. McLaren emailed Laudes the EFIC SOW for the contract, which also contained the contract terms. These documents reflected the expedited nature of the contract formation in that they only set forth the general nature of the expectations of the contractor. The contract terms indicate, obtusely, that the contract would be paid with Iraqi Government funds, but there is no indication that the contracting party was to be the Iraqi Government, which up to that point had no involvement in the acquisition.

28. Due to its work on other projects, Laudes did not initially want to make an offer on the contract, however, PCO officials, including Mr. McLaren and LTC Hobson, prevailed upon Laudes to submit an offer and undertake the work. In an effort to please the PCO and support an important operation, Laudes submitted a quote to the PCO on October 21, 2004 for $15,542,179.60.

29. Laudes' offer was immediately accepted by the PCO on October 21, 2004; within hours of its submission. Later that day Ms. Sandra Ellis, the comptroller for Laudes signed the

contract alongside Dr. Zaid Cattan, who signed the contract nominally on behalf of the Ministry of Defence of Iraq ("MOD"). The contract was signed on a Standard Form 1449, published by the General Services Administration, the form used by USG agencies for commercial items contract actions, and given an MNF-I contract number – USMI-04-CONTIGFOB-01. Dr. Cattan signed in block 31a. of the form, in which the words "United States of America" were lined out by hand and a stamp with the seal of the MOD applied to the form. In block 18a, the contract indicated that payment would be made by the MOD. Mr. McLaren was listed as the contract administrator, and the contract explicitly stated that it was issued by the "PCO CONTRACTING ACTIVITY."

30. Upon signing the contract, Laudes immediately began preparations to perform.

## C. ***PCO DIRECTS ALL ASPECTS OF PERFORMANCE AND ADMINSTRATION; INCLUDING ENGAGEMENT OF SECURITY SUBCONTRACTOR***

31. PCO officials exercised complete control, with no input or decision-making from any Iraqi official concerning contract requirements or terms, source selection, contract administration, changes, contractor performance, or contract close-out. For instance, Mr. McLaren was actively involved in arranging subcontractors for Laudes. He actively sought out and recommended subcontractors to Laudes based on his personal contacts. He even offered to negotiate terms with recommended subcontractors.

32. Laudes eventually ended up hiring three subcontractors, all based on arrangements made by Mr. McLaren: EODT for security, AISG for laborers, and Sofia (a United States based company) for portable toilets. Laudes had performance issues with all three contractors recommended by Mr. McLaren. Despite these performance issues, Laudes paid all subcontractors in full before it sought payment on the Contract. This failure to be paid resulted in a significant financial hardship, which was compounded by Laudes' bearing the full amount of all up-front mobilization costs.

33. Laudes took direction daily regarding contract performance, invoicing and changes chiefly from LTC Hobson and Mr. McLaren as well as other PCO officials. Additional

direction was provided by the contracting officer's representative ("COR'), Marine Major Scott Conway, on the smallest details of the contract such as the time of convoy departures, the condition of porta-potties and tents, the amount of water and the quantity of supplies. Additionally, Marine Major Keith McVeigh also provided regular direction equivalent to that of Major Conway.

34. PCO officials and their representatives at EFIC verbally directed Laudes to undertake many tasks not set forth in the SOW without any notification to or input from the MOD. These changes did not result in formal written contract modifications. PCO officials directed all aspects of contract administration to include directing Laudes to do whatever was necessary to make the contract a success.

35. Shortly after agreeing to the EFIC contract, a Laudes subcontractor declined to provide services because of concerns about the publicity and security surrounding the Fallujah project. Shortly thereafter, a replacement subcontractor began working for Laudes, and its owner's son was kidnapped. As a result, that subcontractor stopped performing in Fallujah and the subcontract was terminated. A third company was hired, and subsequently terminated because of substandard performance. A fourth company was hired, at the specific direction of PCO official McLaren, and was eventually able to perform with intense guidance and direction from Laudes personnel.

36. Operations surrounding the Fallujah project were very difficult, costly and time-consuming. Security was a constant problem. Nearly half of every day was spent trying to get through checkpoints, even though the distance was only about 70 kilometers from Baghdad. All vehicles entering or departing EFIC required convoy protection, which had to be constantly arranged for with MEF personnel.

37. The camp site was repeatedly attacked by insurgents. Iraqi forces routinely destroyed, pilfered and stripped equipment such as shower heads and acted in other destructive ways.

38. Once ISF began to occupy EFIC, members of the Iraqi forces used violence and

intimidation against Laudes' workers. ISF personnel at the Fallujah camp routinely threatened, harassed, and attacked Laudes workers. One incident occurred while LTC Hobson was on site doing a walk-through. One Laudes worker had his arm broken and another was forced to the ground with a weapon to his head.

39. Laudes communicated these concerns to MNF and PCO officials, who expressly authorized and directed Laudes to hire a security subcontractor, and in fact, identified and recommended the contractor Laudes ultimately hired -- EODT. PCO officials recognized and agreed that hiring a security sub-contractor resulted in compensable costs for Laudes that would increase the overall cost of the contract.

40. PCO officials repeatedly stated orally that Laudes would get paid for hiring EODT and that there would be a written contract modification issued to memorialize the oral promises. Despite their promises, PCO officials never followed up with a written modification.

41. The PCO officials who assured Laudes that it would be paid to hire the security subcontractor had the authority to make those assurances. Authority to bind the U.S. Government contractually was an integral part of the assigned duties of such PCO officials, and appropriate or essential to the performance of their duties. Alternatively, the contracting officer was aware of these assurances and never objected to them, and never directed the PCO officials to cease making them.

42. Laudes performed on the contract from on or about October 21, 2004 until or about December 23, 2004. It submitted its final invoice to the PCO for $18,463,953.60 on December 23, 2004. This amount was only $2,921,744 more than its quote. The difference results entirely from Laudes' hiring the security firm of EODT at the express direction of PCO to protect Laudes' workers from the Iraqi troops they were supporting even though Laudes experienced a number of events beyond its control and SOW changes that then drove up its costs.

**D.** ***<u>PCO'S UNDERTAKING TO ASSURE PAYMENT</u>***

43. Naturally, given the chaos in Iraq and the limited functionality and responsibility

of the Iraqi government, Laudes had concerns about receiving payment from the MOD. To allay Laudes' concerns, as an inducement to sign the contract, PCO officials, including, without limitation, Mr. McLaren and LTC Hobson repeatedly orally assured Laudes that it would receive payment for its work because the PCO would facilitate and obtain payment for Laudes from the MOD.

44. PCO officials made similar promises and undertakings to facilitate and obtain payment for Laudes to Laudes during the course of Laudes' performance of the contract, including, without limitation, in connection with Laudes' engagement of the security subcontractor, EODT.

45. But for promises on the part of PCO officials to facilitate and obtain payment, Laudes would not have signed the contract or continued performance. But for these promises to facilitate and obtain payment, Laudes would not have agreed to perform additional and changed work that varied from the EFIC SOW. But for these promises to facilitate and obtain payment for the work to be performed by subcontractors, including the security subcontractor, EODT, Laudes would not have engaged and paid subcontractors.

46. The PCO officials who undertook to obtain payment for Laudes had the authority to do so. Authority to bind the U.S. Government contractually was an integral part of the assigned duties of such PCO officials, and appropriate or essential to the performance of their duties. Alternatively, the PCO contracting officer for the contract was aware of the statements, actions and directions of such PCO officials and never objected to or disaffirmed them, or directed such PCO officials to cease making such statements, actions, and directions.

47. Laudes' reliance on PCO officials' promises was reasonable based on its past experience. In other contracts, the statements of work were orally revised numerous times but never finalized. In each instance in which the statements of work were revised to include additional or changed work, in some cases requiring Laudes to engage subcontractors, Laudes was assured by PCO officials that additional funds would be made available to fairly compensate Laudes for the additional work despite the absence of any executed modifications.

48. Laudes' reliance on PCO officials' promises to obtain payment for Laudes was reasonable also because Laudes was aware of the absolute and thoroughgoing control PCO exercised over the most minute details of the entire contract specification, formation and administration process, contract performance, and payment authorization.

49. PCO officials' actions before, during and immediately after performance, indicate that they believed and understood that PCO had an obligation to authorize and obtain payment for Laudes. PCO assumed direct authority, responsibility and control over the payment process, told Laudes so, and Laudes relied on such authority, responsibility and control in performing the contract. For instance, during performance Mr. McLaren of the PCO Contracting Activity wrote to Laudes, stating that "the Government [meaning the PCO and MNF-I] must be assured of the success of its funded projects."

50. This understanding was manifested in a clear and detailed form when Laudes sought payment on its final invoice. On January 2, 2005, Mr. McLaren wrote to Laudes:

> The PCO contracts shop is very much part of the East Fallujah Camp Agreement (EFIC); one of our remaining responsibilities under our arrangement with our MOD contract brethren is [sic] ensure that your firm is paid timely and without delay by the MOD budget office after receiving your firm's final invoice. PCO initiated dialogue with Laudes on this very matter two weeks ago. The contentious nature of payment between Prime contractor and subcontractor, on a Military Base that is contractually administered by our PCO office, has now placed our office in [sic] slightly different role than was originally anticipated by the leadership of PCO and MOD; the inability of Laudes to definitize the remaining subcontractor invoice(s) on the Prime contract has now permitted the PCO contract shop to assume direct authority over the payment process concerning this contract.
>
> PCO will allow both parties involved, two (2) more days to settle the issues between your respective companies before PCO renders a final decision for both parties as to their final billing(s).
>
> ***In addition, PCO contracts will ensure fair payment of the monies owed once payment from MOD is seen as impending***. In the extreme that Laudes Corporation and AISG [subcontractor] cannot find a solution, PCO will provide the opportunity to have each contractor separately bill their PCO approved invoices to the MOD separately. ***Under this approach, PCO assumes direct authority over the process of payment and the responsibility of***

> ***<u>deficiencies, if any, concerning, concerning any lingering details of the ongoing EFIC operation.</u>***
>
> Please do not make the mistake or be confused in anyway that PCO is anything other than deeply involved in the EFIC agreements, including all subcontractor complaints, constraints or complements of any kind. (emphases added).

51. This email evidences PCO's authority over, and its express undertaking to facilitate and obtain, payment of monies due Laudes. But for this undertaking, in the chaos of occupied Iraq, and the highly dubious creditworthiness of the IIG, Laudes would not have entered into or performed the contract.

52. Even well after performance, in September 2006, the successor to the PCO, the Joint Contracting Command ("JCC") continued to recognize its obligations to obtain payment for Laudes. Air Force Colonel Albert Whitley of the JCC wrote to Laudes in reference to its unpaid contracts in September 2006 that "We are not letting this issue rest until all of the vendors are paid."

53. While Laudes performed in good faith its obligations in reliance on the agreement that PCO would facilitate and obtain payment, the PCO failed and refused to uphold its end of the bargain.

54. In what an e-mail from PCO official McLaren to another PCO official later described as an "end run" around PCO, Ms. Sandra Ellis, Laudes Comptroller, resorted to traveling to the MOD herself and demanding payment from the IIG, which had had no involvement with the contract since its inception. After several days of efforts, the MOD made a partial payment to Laudes of $8,003,346.00. Laudes only sought a partial payment at the time because it had not yet received all invoices from its subcontractors and paid those, which it wanted to do before seeking full payment on the contract. To reinforce that a balance would remain on the contract after payment of the $8,003,346.00, Laudes' invoice was clearly marked as a request for partial payment.

55. On information and belief, this partial payment was made by MOD at the direction of the PCO and/or the U.S. State Department. On information and belief, at the very

same time it was assuring Laudes of the PCO's bona fide efforts to obtain payment, unbeknownst to Laudes, PCO officials were delaying and obstructing Laudes' efforts to be paid in full, and directing the MOD not to pay the full amount of the final Laudes invoice. PCO officials failed to inform Laudes that the United States State Department had "capped" funding for the EFIC contract at an amount far below even the face amount of the contract. On information and belief, PCO was aware of this fact even as they were directing Laudes to continue to perform, resolve disputes with subcontractors, and/or submit final invoices to PCO for payment.

## IV. *COUNT 1 –BREACH OF IMPLIED-IN-FACT CONTRACT*

56. Laudes repeats and realleges Paragraphs 1 through 55 hereof, inclusive, incorporating the same herein by reference as set forth herein in their entirety.

57. As an inducement for Laudes to enter into and perform USMI-04-CONTIGFOB-01, to accept directions to perform additional and changed work, and to engage subcontractors, PCO officials offered, undertook, and promised Laudes that PCO would facilitate and obtain payment for the work Laudes performed on the referenced contract.

58. In making such offer, undertakings and promises, PCO intended to induce Laudes to enter into and perform the referenced contract, accept directions for additional and changed work, and to engage subcontractors.

59. Manifesting its assent to the foregoing offer, undertakings and promises, Laudes accepted the contract, performed its obligations thereunder, accepted directions for changed and additional work and engaged and paid subcontractors in accordance with those directions.

60. But for the foregoing offer, undertakings, and promises, Laudes would not have entered into the contract, accepted directions for changed and additional work or engaged and paid subcontractors in accordance with those directions.

61. The PCO officials with whom Laudes dealt and who made the foregoing offers, undertakings and promises, including, without limitation, T.J. McClaren, Senior Contracts

Administrator, PCO Contracts Activity, and LTC Hobson, PCO Contracts Activity, had authority to do so. Authority to bind the U.S. Government contractually was an integral part of the assigned duties of such PCO officials, and/or appropriate or essential to the performance of their duties. Alternatively, the PCO contracting officer for USMI-04-CONTIGFOB-01 was aware of the pertinent statements, actions and assurances of the foregoing PCO officials, and never objected to or disaffirmed them, or directed such PCO officials to cease making such statements, actions, and directions.

62. The U.S. Government, by and through the foregoing PCO officials, breached, failed and refused to perform its promises and undertakings to Laudes.

63. On information and belief, said breach was in bad faith and in violation of the implied covenant of good faith and fair dealing.

64. As a direct and proximate result of the foregoing breach Laudes received only partial payment for the contract and payments made to subcontractors, and suffered damage and injury in the amount to be proven at trial, which is not less than $10,460,607.60, exclusive of interest.

//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//

## V. ***PRAYER FOR RELIEF***

**WHEREFORE**, Laudes Corporation prays for relief as follows:

1. Judgment against the United States on Count 1 in an amount not less than $10,460,607.60, the exact amount to be proven at trial;

2. Interest and attorneys fees as permitted by law; and

3. Such other and further relief as the Court deems just, necessary and proper.

DATED this 29th day of February, 2008.

**LAUDES CORPORATION**

By: [signature]
Mark G. Jackson, WSBA #18325

GARVEY SCHUBERT BARER
1191 Second Avenue, Suite 1800
Seattle, Washington 98101
(206) 464-3939
(206) 464-0125 – fax

Counsel of Record for
LAUDES CORPORATION