No. 1:08-cv-00121
(Judge Wheeler)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

LAUDES CORPORATION,

Plaintiff,

vs.

THE UNITED STATES,

Defendant.

---

# PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR DISMISSAL OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT, AND PLAINTIFF'S ALTERNATIVE MOTION FOR CONTINUANCE FOR PURPOSES OF DISCOVERY PURSUANT TO RCFC 56(f)

---

Mark G. Jackson, WSBA #18325
GARVEY SCHUBERT BARER
1191 Second Avenue, Suite 1800
Seattle, Washington 98101
(206) 464-3939
(206) 464-0125 – fax

Counsel of Record for
LAUDES CORPORATION

July 17, 2008

TABLE OF CONTENTS


I. Plaintiff's Statement of the Issues ........ 1

II. Plaintiff's Statement of the Case ........ 2

III. Plaintiff's Statement of Facts ........ 4

IV. Argument ........ 4

A. Standards of Review ........ 4

1. RCFC 12(b)(1): Facial and Factual Challenges to Jurisdiction ........ 4

2. RCFC 12(b)(6): Failure to State a Claim Upon Which Relief May be Granted ........ 6

3. RCFC 56: Summary Judgment Standards ........ 7

B. Defendant's Challenges to Subject-Matter Jurisdiction Are Insufficient to Support Dismissal ........ 8

C. The Allegations of the Complaint Sufficiently Plead a Contract ........ 11

D. Defendant is Not Entitled to Judgment as a Matter of Law, And Genuine and Material Issues of Fact Preclude Dismissal of this Case on Summary Judgment ........ 13

1. The Written Contract Between Laudes and MOD Does Not, as A Matter of Law, Foreclose U.S. Government Liability for Actions of PCO Officials Taken Under Authority of the U.S. Government ........ 13

2. PCO Communications Demonstrate the Existence of Genuine and Material Issues of Fact Precluding Summary Judgment ........ 19

E. Laudes is Entitled to Deferral of the Ruling on Defendant's Motion to Facilitate Discovery and Develop the Facts Concerning the Relationship Between The U.S. Government and the Iraq MOD Generally and In Connection with Laudes' Work and Contract and the Capacity in Which PCO Officials Were Acting ........ 25

V. Conclusion and Prayer for Relief ........ 26

TABLE OF AUTHORITIES

**Cases**

*Ainslie* v. *United States*, 355 F.3d 1371, 1373 (Fed. Cir. 2004) ........ 12
*Anderson* v. *Liberty Lobby, Inc.* 477 U.S. 242, 248-50 (1986)........ 7, 25
*Arbitrajae Casa de Cambio S.A. de CV* v. *United States*, 79 Fed. Cl. 235 (2007) ........ 6, 12
*Atlas Corp.* v. *United States,* 895 F.2d 745 (Fed. Cir. 1990)........ 15
*Barrett* v. *Nicholson*, 466 F.3d 1038 (Fed. Cir. 2006) ........ 5, 11
*Bell Atlantic* v. *Twombly*, 127 S. Ct. 1955, 1965 (2007)........ 6, 12
*Celotex v. Catrett,* 477 U.S. 317, 326 (1986) ........ 26
*Crater Corp.* v. *Lucent Techs., Inc.,* 255 F.3d 1361, 1366 (Fed. Cir. 2001) ........ 7
*First Annapolis Bancorp* v. *United States*, 54 Fed. Cl. 529, 538 (2002)........ 5
*Goolsby* v. *United* States, 21 Ct. Cl. 629, 632 (1990) ........ 25
*Greenhill* v. *United States,* 81 Fed. Cl. 786, 790 (2008) ........ 5, 6
*Henke* v. *United States,* 60 F.3d 795, 797 (Fed. Cir. 1995)........ 5, 6
*ITT Federal Support Services* v. *United States*, 531 Fed. 522 (Ct. Cl. 1976) ........ 15, 16
*Klebe* v. *United States*, 263 U.S. 188 (1923)........ 16
*Mann* v. *United States,* 334 F.3d 1048, 1050 (Fed. Cir. 2003)........ 7
*Mansfield* v. *United States,* 71 Fed. Cl. 687 (2006) ........ 26
*Mauras* v. *United States,* ___ Fed. Cl. ___, No. 07-689 C........ 4, 12
*Opryland* v.*Great American Music Show,* 970 F.2d 847 (Fed. Cir. 1992)........ 26
*Reynolds* v. *Army & Air Force Exch. Serv.*, 846 F.2d 746 (Fed. Cir. 1988) ........ 5
*Schism* v. *United States*, 316 F.3d 1259 (Fed. Cir. 2002)........ 14, 15
*Swanson* v. *Levy,* 509 F.2d 859 (9th Cir. 1975)........ 18
*Tippett* v. *United States*, 185 F.3d 1250, 1254-55 (Fed. Cir. 1999)........ 5
*Trauma Service Group* v. *United States,* 104 F.3d 1321 (Fed. Cir. 1997)........ 14, 15

**Statutes**

Tucker Act, 28 U.S.C. § 1491(a)(1)........ 1, 2, 3, 4, 8, 11, 16, 19

**Other Authorities**

2 J. W.M. Moore, *Moore's Federal Practice*, § 12.30[3] & n.10........ 5, 11
Restatement (Third) of Agency, § 1.01 ........ 20

**Rules**

RCFC 12(b)(1) ........ 1, 2
RCFC 12(b)(6) ........ 12
RCFC 56 ........ 1, 7
RCFC 56(c)........ 3, 7, 19
RCFC 56(e)........ 20, 25
RCFC 56(f) ........ 1, 2, 25, 26
RCFC 56(h)(2) ........ 3, 4
RCFC 7.2(c)........ 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| LAUDES CORPORATION, )<br>Plaintiff, )<br>v. )<br>THE UNITED STATES, )<br>Defendant. ) | Case No. 1:08-cv-00121<br>(Judge Thomas C. Wheeler) |

PLAINTIFF'S OPPOSITION TO
DEFENDANT'S MOTION FOR DISMISSAL
OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT, AND PLAINTIFF'S
ALTERNATIVE MOTION FOR CONTINUANCE FOR PURPOSES OF DISCOVERY
PURSUANT TO RCFC 56(f)

Pursuant to Rule 7.2(c) of the Rules of the Federal Court of Claims ("RCFC"), Plaintiff Laudes Corporation ("Laudes") hereby respectfully submits the following Objections in Opposition to the Defendant's Motion for Dismissal, or, in the Alternative, for Summary Judgment, filed on June 16, 2008, and respectfully requests the Court to deny such Motion outright. Alternatively, pursuant to RCFC 56(f), Plaintiff requests the Court to deny Defendant's motion to dismiss under RCFC 12(b)(6), continue this action, and defer its ruling on the Government's RCFC 56 and 12(b)(1) motions, to give Laudes an opportunity to fully develop through discovery the common facts upon which both the merits of Laudes' claim and this Court's jurisdiction may depend.

## I. ***Plaintiff's Statement of the Issues***

A. Whether Laudes' complaint adequately alleges a basis for subject matter jurisdiction under the Tucker Act, 28 U.S.C. § 1491(a)(1), taking all well-pleaded allegations as true and giving Laudes the benefit of all reasonable inferences?

B. Whether Laudes' complaint adequately states a claim upon which relief may be granted, taking all well-pleaded allegations as true and giving Laudes' the benefit of all reasonable inferences, pursuant to RCFC 12(b)(6)?

C. Whether Defendant is entitled at this time to summary dismissal of Laudes' complaint for want of subject matter jurisdiction under the Tucker Act, 28 U.S.C. § 1491(a)(1), pursuant to RCFC 12(b)(1), without Laudes having had the opportunity to take discovery to develop the common, inextricably intertwined, facts upon which both the merits of the case and this Court's jurisdiction, may depend?

D. Whether the single document Defendant offers in support of its motion discharges its initial burden under RCFC 56(c) of demonstrating an absence of any genuine issue of material fact and its entitlement to judgment as a matter of law?

E. Whether the Defendant's motion and the singular document offered in support thereof, and this opposition and the internal Government communications offered by Laudes in support, demonstrate the existence of genuine issues of material fact?

F. Whether, pursuant to RCFC 56(f), the Court should defer its ruling on Defendant's dispositive motion to afford Laudes an opportunity to take discovery on and develop the facts concerning issues identified in Laudes' RCFC 56(f) Affidavit, appended hereto, upon which the merits of this case and this Court's jurisdiction both may depend?

## II. ***Plaintiff's Statement of the Case***

Defendant's motion to dismiss pursuant to RCFC 12(b)(1) and 12(b)(6) must be denied. For reasons set forth in detail below, Laudes' complaint adequately pleads allegations of specific fact which, when proven after discovery, will establish this Court's jurisdiction and grounds

entitling Laudes to relief under the Tucker Act, 28 U.S.C. § 1491(a)(1) for breach of the implied-in-fact contract pleaded in Laudes' complaint.

Further, the Government has failed to discharge its burden of establishing its entitlement to summary judgment under RCFC 56(c) as a matter of law at this nascent stage of the case. As we demonstrate below, Defendant's alternative motion for summary judgment, and the single document proffered by the Government in support thereof, fail to demonstrate a lack of material, disputed issues of fact entitling the Government to judgment as matter of law on the well-pleaded claim Laudes asserts here, and the Court's subject-matter jurisdiction over that claim.

Indeed, Defendant's motion and the singular document offered in support of it illustrate and emphatically underscore the existence of material, genuine issues of fact precluding summary disposition at this time. The uncontested allegations of Laudes' complaint, documents and communications of the U.S. Government offered by Laudes in opposition to this motion pursuant to RCFC 56(h)(2)[1], and the Government's assertions in its motion frame several material and genuine issues of fact, including: (a) the capacity in which PCO officials acted in relation to Laudes in connection with the matters alleged in the Complaint, and whether in performing those actions PCO officials were acting under authority and for the benefit of the U.S. Government, as Laudes contends, or, as agents of the Iraqi MOD, as Defendant contends; (b) whether the U.S. Government actually had no control over funding and payment for Laudes' work, as Defendant asserts; and (c) whether a written contract, to which the Defendant asserts the U.S. Government was not a party, reflects the intention of the parties to this case to foreclose PCO from undertaking any contractual duties to Laudes, other than acting on behalf of and as the agent of the Iraqi government. In the face of such factual issues, Laudes may not be deprived of

[1] *See* Plaintiff's Consolidated Response to Defendant's Proposed Finding of Uncontroverted Facts and Proposed Findings of Uncontroverted Facts appended hereto ("LPFUF"), and Exhibits LA-1 through 6 thereto.

its right to discovery and trial, and Defendant's attempt to pretermit this action summarily must be rejected.

In the event it does not deny outright Defendant's motions, Laudes requests the Court to defer its ruling on them. Plaintiff is entitled to discovery concerning the issues identified above, to develop the facts upon which the Court's jurisdiction and the merits of Plaintiff's claims may depend.

## III. ***Plaintiff's Statement of Facts***

Plaintiff herein incorporates by reference Plaintiff's Consolidated Response to Defendant's Proposed Finding of Uncontroverted Facts and Proposed Findings of Uncontroverted Facts, filed herewith in a separate document appended hereto pursuant to RCFC 56(h)(2) ("LPFUF").

## IV. ***Argument***

### A. *Standards of Review*

Defendant seeks relief under RCFC 12(b)(1), 12(b)(6), and 56 in its motion. In this section, Laudes addresses the legal standards of review for dispositive motions brought under each of the foregoing Rules, and their application to Defendant's motion.

#### 1. *RCFC 12(b)(1): Facial and Factual Challenges to Jurisdiction*

The burden of establishing the Court's jurisdiction lies with the plaintiff, and the plaintiff's statement of claim determines whether a case is within a court's competence. *Mauras* v. *United States,* ___ Fed. Cl. ___, No. 07-689 C, at 3 (issued for publication, June 18, 2008). In order to successfully invoke jurisdiction under the Tucker Act, 28 U.S.C. § 1491(a)(1), a plaintiff must identify an express or implied contract, a constitutional provision, a statute, or a regulation that provides a separate substantive right to money damages against the United States. *Greenhill*

v. *United States,* 81 Fed. Cl. 786, 790 (2008), *citing Tippett* v. *United States*, 185 F.3d 1250, 1254-55 (Fed. Cir. 1999). A claim sounding in contract provides such a right to damages. *First Annapolis Bancorp* v. *United States*, 54 Fed. Cl. 529, 538 (2002). In ruling on the sufficiency of a plaintiff's invocation of jurisdiction on a motion to dismiss under RCFC 12(b)(1) the Court assumes the allegations of the complaint as true, and construes those allegations in plaintiff's favor. *Henke* v. *United States,* 60 F.3d 795, 797 (Fed. Cir. 1995). If the plaintiff pleads the existence and breach of a contract with the Government, and those allegations are unchallenged, then they are sufficient to support the exercise of Tucker Act jurisdiction. *Reynolds* v. *Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988).

If a motion to dismiss for lack of subject matter jurisdiction, however, challenges the truth of the jurisdictional facts alleged in the complaint, the court may consider relevant evidence outside the pleadings in order to resolve the factual dispute. *Id.* In that event, the plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence. *Id.*

In situations where a factual dispute upon which jurisdiction depends must be resolved by the Court, "the general rule is that the party asserting jurisdiction must be permitted discovery of facts demonstrating jurisdiction, at least where the facts are peculiarly within the knowledge of the opposing party." *Barrett* v. *Nicholson*, 466 F.3d 1038, 1042-43 (Fed. Cir. 2006) (citation and internal quotation marks omitted). To the extent that the "jurisdictional facts are too intertwined with the merits to permit the determination to be made independently, the court should either employ the standard applicable to a motion for summary judgment (if the material jurisdictional facts are undisputed), or leave the jurisdictional determination to trial." 2 J. W.M. Moore, *Moore's Federal Practice*, § 12.30[3] & n.10 and cases cited therein (3d Ed. 2007).

As we show below in subsection B, taking as true and construing in Laudes' favor the Complaint's allegations as to the existence of an implied-in fact-contract between Laudes and the U.S. Government, the Complaint survives any facial jurisdictional challenge. Moreover, Defendant's motion raises disputed issues of fact, including whether the PCO acted as the agent of the Iraqi government, had no control over funding and payment for Laudes' work, and the intent of the parties to this case as reflected in a written contract that was not even signed by one of them, the Defendant. Laudes' entitlement to discovery concerning the actual relationship between PCO and the Iraqi government in respect of PCO's dealings with Laudes, generally, and actual control over funds and the payment decisions at issue here, in particular, preclude summary resolution of any factual challenge to the Court's jurisdiction at this time.

2. *RCFC 12(b)(6): Failure to State a Claim Upon Which Relief May be Granted*

The Court must deny a motion to dismiss pursuant to RCFC 12(b)(6) if the complaint's factual allegations are sufficient to "raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Greenhill,* 81 Fed. Cl. at 789, *quoting Bell Atlantic* v. *Twombly*, 127 S. Ct. 1955, 1965 (2007). On such a motion, in addition to taking all allegations in the complaint as true, the Court must also draw all reasonable inferences in the plaintiff's favor. *Henke,* 60 F.3d at 797.

Where a complaint alleging an agreement "contains enough factual matter (taken as true), to suggest that an agreement was made," it is sufficient to withstand a Rule 12(b)(6) motion. *Twombly,* 127 S.Ct. at 1965. *See also Arbitrajae Casa de Cambio S.A. de CV* v. *United States*, 79 Fed. Cl. 235 (2007) (complaint alleging series of meetings, correspondence and memoranda sufficient to allege facts, which, if proven, would establish an implied-in-fact contract, motion to

dismiss denied). In Subsection C, *infra*, we demonstrate that, on its face, Laudes' complaint meets this liberal standard.

3. *RCFC 56: Summary Judgment Standards*

RCFC 56(c) provides:

> [Summary] judgment . . . shall be rendered . . . if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

RCFC 56(c).

On a motion for summary judgment pursuant to RCFC 56, the moving party has the initial burden of demonstrating "the absence of any genuine issue of material fact and its entitlement to judgment as a matter of law." *Crater Corp.* v. *Lucent Techs., Inc.,* 255 F.3d 1361, 1366 (Fed. Cir. 2001). A fact is material if it "might affect the outcome of the suit under the governing law," and an issue is genuine if it "may reasonably be resolved in favor of either party." *Anderson* v. *Liberty Lobby, Inc.* 477 U.S. 242, 248-50 (1986). The Court may not weigh the evidence or resolve disputed issues of fact on a summary judgment motion. *Id.* Under RCFC 56, the Court must draw all justifiable inferences from the underlying facts in the light most favorable to the nonmoving party. *Mann* v. *United States,* 334 F.3d 1048, 1050 (Fed. Cir. 2003).

In Subsection D, we show that Defendant's motion must be denied outright because the sole support proffered by the Defendant -- a written contract, signed by Laudes and nominally by an official of the Iraqi MOD, but not by the PCO or any other agency of the U.S. Government -- does not discharge the Government's initial summary judgment burden. Far from demonstrating the requisite absence of disputed material facts and Defendant's entitlement to judgment as a matter of law, that document itself illustrates the existence of material, genuine issues of fact in

this case that preclude summary judgment. Moreover, the uncontested allegations of Laudes' complaint and internal PCO communications Laudes offers in opposition to this motion (*see* LPFUF and supporting Exhibits, LA-1 through LA-6) underscore that there are material, genuine issues of fact regarding: (a) the capacity in which PCO officials acted in relation to Laudes, and whether PCO was acting and agreed to act subject to the control of the Iraqi MOD, as MOD's agent, as the Defendant contends, or, as Laudes claims, under the authority and subject to the control of the U.S. Government; (b) whether the U.S. Government, not the MOD, in fact controlled funding and payment for Laudes' work, and (c) whether the written contract signed by Laudes and MOD, but not by the U.S. Government, reflects an intention on Laudes' and the U.S. Government's part that PCO was, for purposes of its promises to Laudes to assure payment, at all times acting solely and exclusively as the agent of the Iraqi government, and not under the authority of the U.S. Government. Alternatively, because evidence concerning these issues is uniquely within the possession of the U.S. Government, and common questions of fact control both the merits and jurisdiction, Laudes is entitled to discovery and to further develop the record concerning these matters before the Court may rule on Defendant's motion.

### B. *Defendant's Challenges to Subject-Matter Jurisdiction Are Insufficient to Support Dismissal*

Laudes brought this action for breach of an implied in fact contract pursuant to the Tucker Act, 28 U.S.C. § 1491(a)(1). Complaint ("Comp."), at ¶ 3. The allegations of Laudes complaint, on their face, plead the requisite elements of an implied-in-fact contract between Laudes and the U.S. Government. *Id.* at ¶¶ 43-64. It is difficult to discern whether Defendant's motion mounts a facial challenge to the *sufficiency* of Laudes' jurisdictional allegations in invoking RCFC 12(b)(1). To the extent that it does, the applicable standard of review (*see*

Section IV(A)(1), *supra*), requires the Court to deem the allegations true and construe them favorably to Laudes, precluding dismissal on this basis.

Neither does the Government, strictly speaking, challenge directly the truth of Laudes' jurisdictional allegations in the complaint. Defendant's factual assault on jurisdiction is coextensive with and inextricably bound up with its argument that it is entitled to summary judgment as a matter of law at this stage. Defendant seeks immediate judgment, both on the merits and for want of jurisdiction, based primarily on inferences adverse to Laudes it invites the Court to draw from a written contract which involved "Iraqi Ministry of Defense Authorized Funding," signed by an MOD official as "contracting officer" and not any U.S. official, which indicated that PCO would administer the contract. This contract, Defendant urges, effectively forecloses Laudes from pursuing the implied-in-fact contract theory asserted here. This is so, according to Defendant, because that writing establishes conclusively (without the necessity of any discovery, further development of the relevant facts or any other proceedings) that PCO officials whose actions and statements form the basis of Laudes' claim here were, in fact, necessarily acting as agents of the government of Iraq in making promises and undertakings to Laudes, and not acting under the authority of the U.S. Government. *See* Defendant's Motion, at 3 ("to the extent that the American PCO personnel who administered the contract upon behalf of the Iraqi Ministry of Defense made any promises relating to administration of the contract, such promises would have related to their performance as agents of the Iraqi government, and thus not create a contract between Laudes and the United States, within this Court's jurisdiction.").

The Defendant's vision of the effect of the written contract is squarely at odds with Laudes' position in this case. In sharp contrast, Laudes contends that, notwithstanding the

contract upon which Defendant relies in making the promises to Laudes at issue here[2], PCO officials were, in fact, acting under the authority and for the benefit of the U.S. Government, had and exercised authority to bind the U.S. Government, and that the U.S. Government breached those promises. *See* Section IV(D), *supra*, and citations to LPFUF & exhibits attached thereto as LA-1 through LA-6 cited therein.

Thus, Laudes disputes the Government's key contention that the PCO officials acted as agents of the Iraqi government in respect of the alleged promises to Laudes. *See* LPFUF, Section I, at ¶¶ 1-4. The parties' course of dealings reflected in PCO internal communications attached to Laudes' Proposed Findings of Uncontroverted Facts submitted with this opposition suggests that the PCO, in fact, acted under U.S. Government authority, subject to its control, and for its benefit, not that of the Iraqi MOD. LPFUF, Section II, ¶¶ 5, 8, 10, 14, and 19-21 & LA-1 through LA-6. Those documents further show that the U.S. Government may have controlled the funds from which Laudes was to be paid, directed the MOD to pay and not pay certain invoices for Laudes work, and capped those funds without informing Laudes. *Id.* ¶ 5 & LA-1 and ¶¶ 19-21 & LA-5 & 6. Accordingly, Laudes also disputes that the Iraqi government ever controlled the funds and payment for Laudes' work.

Because facts concerning the Iraqi government's actual relationship and dealings with the PCO in respect of the work performed by Laudes, and who actually controlled funding for and decisions concerning payment for that work, are uniquely within the knowledge of the U.S Government, Laudes is entitled to full discovery to test Defendant's contentions that the PCO acted as the agent of the Iraqi government, and not under U.S. authority, in administering the Laudes Fallujah contract (Def. Mot., at 3), and that the U.S. Government had no control or

---

[2] For purposes of this Motion, Defendant concedes that PCO officials in fact, made such promises. Def. Mot., at 2 & n.2.

authority over funding and payment decisions respecting Laudes' work (*Id.* at 6-7 n.4). *Barrett*, 466 F.3d at 1042-43 (citation and internal quotation marks omitted). The merits of the case rise or fall on whether there was an implied-in-fact contract between the Defendant and Laudes, which is also the jurisdictional predicate of Laudes' Tucker Act claim. Clearly, Defendant's factual challenge to jurisdiction is inextricably intertwined with the facts governing the merits, and common disputed issues of fact control the outcome of both questions. In these circumstances, the case should proceed through discovery and trial. 2 J. W.M. Moore, at 12.30[3] & n.10 and cases cited therein.

C. *The Allegations of the Complaint Sufficiently Plead a Contract*

While couched as an attack on the sufficiency of Laudes' pleading, Defendant's Motion, at 2 ("Laudes has not pleaded a valid implied-in-fact contract . . . ."), the Government's motion is not that. Instead, it relies on a series of inferences adverse to Laudes it insists must be drawn from the fact that the written contract proffered by the Government identifies PCO as the "administrator" (a fact which Laudes truthfully pleaded in its complaint, at ¶ 29) and that the agreement states that the Iraqi government would make payment from Iraqi Ministry of Defense authorized funding (DPFUC at ¶¶ 2 & 3). From these references in a document it offers from outside the pleading, Defendant urges the Court to infer that the PCO acted on behalf of and as the agent of the Iraqi government (Defendant's Motion at 3 & 6), and that the contract (which was not signed by the PCO) somehow manifests an intent on the part of both the PCO and Laudes that precludes any implied-in-fact contract between those parties. *Id.* at 3-6. The Court may not indulge these inferences in the Government's favor.

"In order to state a claim for breach of an implied-in-fact contract with the United States, as Plaintiff must allege a mutual intent to contract, including an offer, an acceptance and

consideration. In addition, the plaintiff must allege facts sufficient to show that the government representative who entered into or ratified the alleged contract was authorized to bind the United States to the agreement in question." *Arbitraje Casa De Cambio,* 79 Fed. Cl. at 241 (internal quotations and citations omitted). The elements of an implied-in-fact contract may be alleged based on a series of correspondence, memoranda and meetings. *Id.* The Court must accept all factual allegations as true, and draw all reasonable inferences in the plaintiff's favor. *Ainslie* v. *United States*, 355 F.3d 1371, 1373 (Fed. Cir. 2004); *Mauras,* COFC No. 07-689 C, at 3.

Here, the allegations of Laudes' complaint expressly plead the requisite elements of an implied-in-fact contract. Comp. ¶¶ 43-64. On their face, taken together, the allegations of the complaint contain enough factual matter (taken as true), to suggest that an agreement was made, raising Laudes' right of relief far beyond a mere speculative level. *Twombly*, 127 S. Ct. at 1965. On a RCFC 12(b)(6) motion, the Court may not look beyond the allegations of the complaint to the contract proffered by Defendant. Nor may the Court infer that the PCO acted on behalf of and as the agent of the Iraqi government, and that the contract (which was not signed by the PCO) somehow manifests an intent on the part of both PCO and Laudes that precludes any implied-in-fact contract between those parties, contrary to the allegations of the complaint. Def. Mot., at 3 & 6-7 & n.4. The Court simply may not dismiss this case under RCFC 12(b)(6), consistent with its obligation to take the complaint's allegations as true and to draw all inferences from the complaint favorably to Laudes.

D. *Defendant is Not Entitled to Judgment as a Matter of Law, And Genuine and Material Issues of Fact Preclude Dismissal of this Case on Summary Judgment*

1. *The Written Contract Between Laudes and MOD Does Not, as A Matter of Law, Foreclose U.S. Government Liability for Actions of PCO Officials Taken Under Authority of the U.S. Government*

The Government relies on the written contract document attached to its motion as a talismanic "trump card." It argues that the document requires the Court to ignore Laudes' allegations and glaring factual issues concerning the authority under which PCO was acting in respect of its dealings with Laudes, and grant the Government judgment as a matter of law without further ado. The Government relies on the principle that "[t]here can be no implied-in-fact contract when there is an express contract ***between the parties*** dealing with the same subject matter." Def. Motion, at 2, and authorities cited therein (emphasis added). Yet the central factual premise of Defendant's argument is that the express contract was between Laudes and the Iraqi MOD -- ***not the United States Government.***

The core of Defendant's argument is that, in making the promises to Laudes it concedes for purposes of the motion were made,[3] PCO officials were of necessity and in fact acting as agents of the Iraqi government, and not exercising authority on behalf of and for the benefit of the U.S. Government, as Laudes contends in its Complaint. *See* Defendant's Motion, at 3 ("to the extent that the American PCO personnel who administered the contract upon behalf of the Iraqi Ministry of Defense made any promises relating to administration of the contract, such promises would have related to their performance as agents of the Iraqi government, and thus not create a contract between Laudes and the United States, within this Court's jurisdiction"), *and* 6-7 & n.4.

[3] See note 2, *supra*.

In effect, the Defendant seeks to have its cake, and eat it, too, shirking any burden under the contract, yet seeking to benefit by its existence. It disclaims liability in contract to Laudes because the U.S. Government was not a party to the express contract it proffers, yet argues that the very same contract forecloses any implied undertakings between the U.S. Government and Laudes related to the provisions of a contract to which it claims the Government was not a party. But Defendant goes a bridge too far: its premise that the express contract was between Laudes and the Iraqi MOD takes Laude's claim outside the rubric of the rule of law upon which Defendant relies.

The cases cited by Defendant in support of its effort to end this case before it starts simply do not present facts even remotely analogous to those presented here. Nor do they stand for the legal proposition that an express contract between two parties (one of whom ***is not*** the Government) forecloses conclusively as a matter of law the possibility of an enforceable implied contract between one of the parties and the Government.

*Schism* v. *United States*, 316 F.3d 1259 (Fed. Cir. 2002), involved an implied-in-fact contract claim against the Government by military retirees alleging that ***the Government*** made an implied promise of free post-retirement health care benefits. The Federal Circuit found the substance of the implied-in-fact "contract" directly contrary to the retirees' written enlistment agreements ***with the Government***, which provided that health care benefits would be determined by statute and regulation. *Id.* at 1278.

Similarly, *Trauma Service Group* v. *United States,* 104 F.3d 1321 (Fed. Cir. 1997), the claimant urged alternate theories of liability against the U.S. Government, regarding a right of reimbursement for the services of X-ray technician support personnel under the Civilian Health and Medical Program of the Uniformed Services, administered by the Department of Defense

("CHAMPUS"). The claimant alleged that its express Memorandum of Agreement ***with CHAMPUS*** required reimbursement, an argument which the Court rejected. The Court also rejected the claimant's alternative theory that CHAMPUS was bound to cover support personnel reimbursement on an "implied-in-fact" contract basis, beyond the scope of MOA. The Court found the ***MOA between the claimant and CHAMPUS*** was an express contract that addressed the subject of X-ray technician services, and did not provide for the reimbursement claimant sought, foreclosing the implied-in-fact contract claim on the grounds that "an implied-in-fact contract cannot exist if an express contract already covers the same subject matter." *Id.* at 1326-27. Notably, as in *Schism,* the Government was a party to both the alleged implied-in-fact contract and the conflicting express contract.

The same was true in *Atlas Corp.* v. *United States,* 895 F.2d 745 (Fed. Cir. 1990). There, the plaintiffs were corporations that entered into express contracts ***with the Government*** for the production of uranium or thorium. They sought recovery of the costs associated with stabilization of radioactive mill tailings generated from the uranium and thorium production under their contracts ***with the Government***. Certain of the plaintiffs urged an "implied-in-fact" duty on the part of the Government in respect of payment for tailing stabilization costs. The Court rejected the argument, holding: "the plaintiffs have admitted that although the contract prices were determined by considering the plaintiffs' costs, the prices were in fact set by the contracts. The stabilization costs are not 'entirely unrelated' to the costs included in the contract prices. Therefore, there can be no implied agreement to pay costs over and above those prices." *Id.* at 755.

*ITT Federal Support Services* v. *United States*, 531 Fed. 522 (Ct. Cl. 1976) involved "a tug of war between a government contractor and the Government over surplus moneys in a

pension fund established for the cost-plus contractor's employees." There, the contractor alleged an implied-in-fact agreement giving it the right to quantum meruit recovery upon the termination of the formal contract with the Government. The Court held: "[t]here is, however, no basis for finding such an implied-in-fact contract which would support recovery. ***The express contract between ITT/FSS and the Government*** provided for the Government's payment of ITT's costs and an additional fixed fee for ITT's post-termination work on the pension plan, and contemplated plaintiff's continued performance of the pension plan administrative services performed before termination." *Id.* at 528 (emphasis added).

Finally, *Klebe* v. *United States*, 263 U.S. 188 (1923), involved a dispute over steam shovels, which the Government had a right to purchase in a contract between the Government and a construction company, which leased the shovels from the plaintiff. The plaintiff's lease with the construction company expressly granted ***the Government*** the right to purchase the equipment from the plaintiff/owner for the difference between the agreed value of the equipment and lease payments made to that point, which right the Government contracting officer invoked in purchasing them. 263 U.S. at 190-91. Dissatisfied with the amount of that difference, the plaintiff/owner sued the Government for what it thought was the fair market value of the shovels, claiming that the Government had an implied duty to pay fair market value for property appropriated for its use. *Id.* at 190. The Court rejected the claim, holding:

> The parties here stipulated and the Court of Claims found that the property was appropriated by the government as its property under the purchase privilege clause of the contract between plaintiffs and the Bates & Rogers Construction Company. A contract implied in fact is one inferred from the circumstances or acts of the parties; but an express contract speaks for itself and leaves no place for implications. . . . To sustain the contention that the ***express contract is not binding or enforceable in favor of the government*** and consequently that its claim here is not well founded would not help the plaintiffs, since then the resulting cause of action would be one sounding in tort and not within the purview of the Tucker Act.

*Id.* at 192 (emphasis added; internal citations and quotation marks omitted).

In contrast to this case, in each of these cases, the Government was party to or was expressly granted specific rights under a binding express contract, the terms of which the claimant sought to extend or vary through an implied-in-fact contract claim fundamentally inconsistent with the terms of the express contract. Applied in its proper context, the rule Defendant here invokes -- that an express contract between the parties bars pursuit by one against the other of an implied-in-fact contract claim dealing with the same subject matter -- makes good sense. This is so because the express contract represents the final manifestation of the ***contract parties'*** intentions as to their particular rights and obligations ***toward one another***, which understanding should not be varied or modified *post hoc* through the device of an implied-in-fact contract claim.

However, in this case, the very bedrock of the Government's position is that it was ***not a party*** to the MOD-Laudes contract, and thus, that PCO has no obligations to Laudes enforceable against the Government. That being so, the express contract perforce cannot represent the final binding bilateral manifestation of the intentions of the parties concerning the performance of a non-party, because the non-party simply is not bound by and has no enforceable rights or obligations under it. The rationale for the rule, and, accordingly, the rule itself, have no application to the instant case.

Recognizing this fatal flaw in its argument, the Government strains credulity to overcome it through this astounding sophistry: "[i]t is of no moment to our argument that the express contract here was with the Government of Iraq and not with the PCO . . . . [i]f the existence of an express contract addressed the intent of the parties to an alleged implied-in-fact contract, the technical identity of the parties need be of no consequence." Def. Mot., at 5.

The sole authority offered for this incredible proposition is *Swanson* v. *Levy,* 509 F.2d 859 (9th Cir. 1975) a 33 year-old, non-precedential case involving an employment dispute from another circuit, outside the public contract context. Unlike this case, *Swanson* did not deal with the propriety of a pre-answer motion to dismiss or for summary judgment, but whether there was sufficient evidence to support the district court's judgment after a full trial on the merits. In any event, unlike Defendant here, the Court of Appeals invoked the rule "[a]n action does not lie on an implied contract where there exists ***between the parties*** a valid express contract which covers the same subject matter," with the "identity of parties" element intact. *Id.* at 861 (internal quotation marks and citation omitted). The Court of Appeals, employing a very vague corporate veil-piercing standard, found there was sufficient evidence adduced at trial to support the conclusion that the ***appellee and appellant were parties to an express contract of employment***, and refused to disturb the judgment below. *Id.* Certainly, this highly fact-dependent case, in which the court applied a rule ***requiring an identity between the parties to the express contract and the alleged implied contract***, offers no support for Defendant's notion that the precise identity of the parties to the express contract at issue is "of no consequence."

For the foregoing reasons, the written contract proffered by Defendant does not bar as a matter of law Laudes' claim. Nor does it conclusively establish beyond dispute and as matter of law, as Defendant contends, that PCO officials were acting as the agents of MOD in respect of their dealings with Laudes. Indeed, the document itself is a muddle as to the true role occupied by PCO and the U.S. Government, and that of the Iraqi MOD. It was formally signed and entered into by an official of the Iraqi MOD, but contains references indicating that PCO issued the document and would administer the contract. Contrary to the Defendant's assertions, it certainly does not reflect the clear, unmistakable intentions of the parties to this action -- Laudes

and the U.S. Government -- that the PCO would at all times be acting as the agent of the Iraqi MOD in administering the contract. Yet it is the sole support Defendant offers for that contention. Accordingly, Defendant has failed to discharge its initial burden to bring forward evidence demonstrating an absence of a genuine, material issue of fact and the Government's entitlement to judgment as a matter of law. *See* RCFC 56(c). The motion must be denied outright for that reason alone.

2. *PCO Communications Demonstrate the Existence of Genuine and Material Issues of Fact Precluding Summary Judgment*

The Government's assertions in Defendant's Proposed Finding of Uncontroverted Facts, and the copy of the written contract which it claims Laudes entered with the Iraqi Ministry of Defense ("MOD") proffered in support of those proposed findings, are not dispositive of this implied-in-fact contract claim.[4] With an unwarranted conclusion that the written contract signed by the Iraqi MOD conclusively establishes that PCO acted as the agent of the Iraqi MOD, Defendant attempts to sidestep Laudes' complaint's allegations that PCO acted for and under authority of the U.S. Government and subject to its control, and not that of the Iraqi MOD, relating to the specific dealings with Laudes alleged here.[5]

[4] To be clear, Laudes is currently pursuing an alternative theory of liability based on the express written contract in a Contract Disputes Act ("CDA") claim before the PCO, but that claim may not yet be ripe for judicial action, as Laudes is still endeavoring to exhaust its remedies before PCO on that claim. In its pending CDA claim, Laudes' theory is that the U.S. Government was in effect a party to or may be charged with breach of the express written contract the Government appends to its motion for summary judgment here. But that is not Laudes' theory in the Tucker Act claim before the Court in this case.

For purposes of this claim, Laudes assumes, (without conceding, but expressly reserving, the point for purposes of its alternate theory of CDA liability and without waiving or prejudicing its alternate theory), that the Iraqi MOD was at least nominally the other party to the written contract appended to Defendant's motion.

[5] These allegations, which have not been controverted or challenged by Defendant, are set forth in detail as part of Laudes' Proposed Findings of Uncontroverted Facts, appended hereto in LPFUF Section II.

Such control by the principal, and assent by the agent to such control, is the very essence of the agent-principal relationship. "Agency is the fiduciary relationship that arises when one person ("principal") manifests assent to another person ("agent") that ***the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent, or otherwise consents to so act***." Restatement (Third) of Agency, § 1.01 (emphasis added). Yet other than the written contract discussed above, which is obscure on this point at best, the Government advances not a whit of evidence establishing that the Iraqi government, in fact, had the right or power to control the PCO officials' activities, or that the PCO ever agreed to act subject to Iraqi government control.

PCO internal communications marshaled by Laudes in opposition to Defendant's motion bolster Laudes' allegations on this point, and they demonstrate "specific facts showing there is a genuine issue for trial." RCFC 56(e). *See* LPFUF, Section II, ¶¶ 5, 8, 10, 14, and 19-21 & LA-1 through LA-6. They strongly suggest that PCO at all times was acting under the authority and control of the U.S. Government, and for its benefit, and not that of the Iraqi MOD.

Contrary to Defendant's contention that the "contracting officer for the contract [USMI-04-CONTIGFOB-01] was Dr. Ziad Cattan of the Iraqi Ministry of Defense," Def. Motion, at 7 n.4, a PCO memorandum demonstrates that United States Air Force Major Kenneth R. Caryer, of the PCO, was designated by PCO as Contracting Officer for the U.S. Government on Contract USMI-04-CONTIGFOB-01, and, in fact, exercised powers incident to that position. LPFUF, Section II ¶ 10 & LA-3 (PCO Memorandum signed by Major Caryer as "Contracting Officer"). By this memo, Major Caryer, acting under the authority of the PCO, appointed Lt. Col. Hobson, as the Contracting Officer's Representative for the referenced contract. LA-3. If Dr. Cattan of the MOD was, in fact, the responsible contracting officer, as Defendant contends, then why

would Caryer, as opposed to Cattan, appoint Lt. Col. Hobson as the contracting officer's representative? There is no question that Lt. Col. Hobson played a central role in developing the specifications for and directing and supervising Laudes' work, and this document indicates that he derived his representative authority to do so not from Dr. Cattan, but from Major Caryer, PCO's official contracting officer on this contract. This memo is not signed by or copied to Dr. Cattan or any other MOD official, nor is there any indication on this document to suggest that either Caryer or Hobson were acting under MOD authority in connection with the powers referenced in the memo. *Id.*

While the contract upon which Defendant relies states that payment will be made by the Iraqi MOD and identifies in block 25 Iraqi Ministry of Defense Authorized Funding (DPFUF at ¶ 2), internal PCO communications also indicate that officials of the U.S. Government had authority and exercised control over funding, budgeting and payment decisions, imposed a funding cap for the Fallujah camp effort upon which Laudes worked, and that U.S. officials, not MOD officials made final decisions concerning payment of Laudes' invoices. *See* LPFUF, at Section I, ¶¶ 2-4, and Section II, ¶¶ Section II, *infra*, ¶ 5 & LA-1 (E-mail exchange between Lt. Col. Hobson, PCO, and Col. Saul, Chief of Strategic Plans, MNF-I), and ¶¶ 19-21 & LA-5 & 6 (E-mails from TJ McLaren, PCO, regarding payment of Laudes invoices).

In one e-mail, dated October 19, 2004, at a time when the two U.S. colonels were defining the specifications for the work that would be awarded days later to Laudes, Lt. Col. Hobson tells Col. Saul: "I need to get a solid requirement from you on what you [sic] basic need is going to be and funding." Col. Saul's reply of 10:27 am addresses Lt. Col. Hobson's funding points: "I was under the impression that we budgeted the Iraqi $10m for a bde (5000) over three months. I am not expecting anything like that duration or cost here." At 5:06 pm, Hobson sent

an e-mail to Saul asking: "any idea when we will have funding? We can begin some preliminary heads up with the contractors until funding is obtained." At 5:36 pm. Saul responded, saying "Patrick [meaning, Patrick Marr, of the United States State Department, who is copied on the e-mail at the address marrpm@state.gov] has the money trail sorted out." Hobson replied at 6:50 pm, and copied Marr: "I will get with Mr. Marr to iron out the funding so we can officially get this on the street. I assume Mr. Marr will be able to provide me the locations when I see him on the funding." LPFUF, Section II, ¶ 5, LA-1.

Another internal PCO communication referencing the role of Patrick Marr of the U.S. State Department strongly corroborates Laudes' belief that the U.S. Government, not the Iraqi MOD or Iraqi government, controlled budgeting and funding for the EFIC project, and made final decisions concerning payment of Laudes' invoices. After Laudes presented its invoices for payment, it received only a partial payment, Ms. Sandy Ellis, Laudes' Comptroller, hand delivered the invoice for the balance to Dr. Cattan. LPFUF, Section II, at ¶ 20. T.J. McClaren, a civilian official of PCO, in an e-mail to a fellow PCO official, described this as an "end run" around PCO. LPFUF, Section II, ¶ 21 & LA-5. This particular e-mail is very revealing about the actual relationship between the U.S. Government and the Iraqi MOD on the key issue of ultimate control over funding and payment for Laudes' work:

> ***EFIC [FUNDING] HAS ALREADY BEEN CAPPED BY STATE DEPARTMENT, CURTISY [sic] OF MR. PATRICK MARR***. . . . LT. COL. HOBSON INITIALLY GAVE THEM [Laudes] THE BOOT, THEN EXPLAINED TO THEM WHY HE WASN'T GOING TO PAY THEM THE REMAINING $8 MILLION. SANDY TRIED TO PULL AN END AROUND AND TOOK THE INVOICE DIRECTLY TO THE MOD INSTEAD. DR ZAIAD [sic] AND SECRETARY GENERAL BRUSKA HAND WALKED THE LAUDES INVOICE DOWN TO BRITISH/COALITION MOD REPRESENTATIVE ***AND HE THEN GAVE IT TO MR. MARR. . . .***

LA-6 (emphasis added).

That an official of the U.S. State Department capped funding for the project, that a PCO

official describes presentment of a Laudes invoice to MOD as an "end run," and that the MOD did not make the decision, but "bucked" the invoice to a U.S. State Department official for an ultimate payment decision all strongly suggest that the PCO, in its dealings with Laudes, was, in fact, acting under the authority and subject to the control of the U.S. Government, and not the Iraqi MOD. This e-mail also suggests that, at the very same time it was assuring Laudes of the PCO's bona fide efforts to obtain payment, unbeknownst to Laudes, PCO officials were delaying and obstructing Laudes' efforts to be paid in full, and directing the MOD not to pay the full amount of the final Laudes invoice, evidence of breach of the promises PCO officials made to Laudes.

Apart from these specific examples, PCO's communications throughout the project reflect generally an understanding on PCO's part that it was acting for the benefit, under authority, and subject to the control of the U.S. Government in connection with its dealings with Laudes. Lt. Col. Hobson and Col. Saul's e-mail exchanges of October 19, 2004, reflecting their efforts to define the scope of work for the effort are copied to other U.S. military and State Department personnel, but no Iraqi MOD or other Iraqi official is party to or copied on any of these e-mails. LPFUF, Section II, ¶ 5 & LA-1. Col. Hobson described the EFIC effort as "***our*** number one priority," not the priority of the Iraqi MOD or Iraqi government. *Id.*

In TJ McLaren's October 20, 2004, e-mail transmitting to Laudes the scope of work document generated by Lt. Col. Hobson and MFN-I Col. Saul, and soliciting Laudes' bid, there is likewise no indication whatsoever that PCO was acting as an instrumentality of the Iraqi government. LPFUF Section II, ¶¶ 6-8 & LA-2. This e-mail was sent by an official of the PCO, an instrumentality of the U.S. Department of Defense, and makes multiple references to desires

and needs of "***the Government***," but none to the Iraqi MOD or Iraqi Interim Authority. *Id.* ¶ 8, LA-2.

To similar effect is a later e-mail from McClaren sent to Laudes' President, Larry Underwood, around the time the security situation was deteriorating, which eventually led Laudes to engage a security subcontractor at McClaren's direction and in reliance on his promise that Laudes would be paid for the increased costs. *See* LPFUF, Section II, ¶¶ 12-14, & LA-4. McLaren's e-mail to Mr. Underwood again refers to PCO as "the Government," and McLaren's role on behalf thereof, in a manner suggesting that McLaren understood that term to mean the PCO and Multinational Force Iraq, both instrumentalities of the U.S. Government:

> ***The Government*** must be assured of the success of its funded projects; ***as the contracts administrator on this effort, and appointed representative to your company and the MFNI***, I need to be informed of all decisions that may or may not affect the success of this [Forward Operating Base] mission.
>
> Information learned will be immediately passed up to the ***Government leadership chain of command, both in PCO and MNFI***.
>
> Please make sure I am in your meeting. TJ

LA-4 (emphasis added). Conspicuously absent from this e-mail is any reference to MOD or the Iraqi government, much less any indication that McLaren's actions were subject to their control and authority. When he refers to PCO and MNF-I in reference to the "Government chain of command," McLaren makes it clear that his references to "the Government" mean the U.S. Government, not the Iraqi MOD.

The Defendant's own communications are more than sufficient to place in genuine dispute Defendant's contention that PCO was acting as the agent of the Iraqi MOD, and not under authority of the U.S. The evidence raises legitimate, substantial questions that can only be resolved in the crucible of discovery and trial. Even if the Court were to regard Defendant's

meager showing as sufficient to discharge the Government's initial RCFC 56(c) burden, the materials Laudes offers in support of this opposition amply demonstrate the existence of genuine issues of fact concerning Defendant's contention as to the capacity in which PCO actually acted. *See* RCFC 56(e)(adverse party's response must set forth specific facts showing that there is an issue for trial). The Court may not, on the record before it, resolve whether those officials were, as Laudes contends, acting under the authority and for the benefit of the U.S. Government in connection with their dealings Laudes, or whether, as Defendant contends, under the authority of and in their capacities as agents of the Iraqi MOD. *See Anderson,* 477 U.S. at 248-50.

Defendant's suggestion that Laudes is trying to hold the Government liable for promises beyond its control as to "what the government of Iraq would do," Def. Mot. at 6, exposes the core of the genuine, highly material, disputes in this case. As Defendant implicitly acknowledges in its final citation to *Goolsby* v. *United* States, 21 Ct. Cl. 629, 632 (1990), ("the Government cannot be held responsible for failing to obtain an agreement from a third party over whom the Government absolutely had no control or authority") the pivotal issues in this case boil down to inherently factual questions of control and authority. The existence of issues of fact concerning those matters precludes summary judgment.

E. *Laudes is Entitled to Deferral of the Ruling on Defendant's Motion to Facilitate Discovery and Develop the Facts Concerning the Relationship Between The U.S. Government and the Iraq MOD Generally and In Connection with Laudes' Work and Contract and the Capacity in Which PCO Officials Were Acting*

In light of the issues framed by Defendant's motion and this opposition, in the event the Court is disinclined to deny outright Defendant's motion, then, pursuant to RCFC 56(f) the Court should defer its ruling on Defendant's motion as premature, and order this case to proceed to discovery on the merits. The Government raises an affirmative matter in avoidance of Laudes' claim, namely, the capacity in which PCO officials were acting in the dealings with Laudes that

form the subject matter of this suit -- yet Laudes has had no discovery nor any opportunity to probe the affirmative contentions the Government raises in its motion. *See Mansfield* v. *United States,* 71 Fed. Cl. 687 (2006) (court deferred ruling on Government's summary judgment motion and ordered case to full discovery on merits where plaintiff had no discovery or opportunity to probe Government's affirmative defense). Laudes' counsel, as required by RCFC 56(f) herewith submits the requisite affidavit, demonstrating Laudes' need to discover information that may be necessary to support Laudes' opposition. As the Federal Circuit acknowledged in *Opryland* v.*Great American Music Show,* 970 F.2d 847 (Fed. Cir. 1992), "that is the safeguard to which Rule 56(f) is directed. *See Celotex v. Catrett,* 477 U.S. 317, 326 (1986) (Rule 56(f) provides nonmovants with protection from being "railroaded" by premature summary judgment motions)."

## ***Conclusion and Prayer for Relief***

**WHEREFORE,** for the foregoing reasons, Plaintiff Laudes Corporation respectfully requests the Court to deny the Defendant United States' Motion for Dismissal outright, and order this case to proceed. Alternatively, pursuant to RCFC 56(f), Plaintiff requests the Court to proceed with this action, and to defer its ruling on the Government's motion, to give Laudes an opportunity to fully develop through discovery the common facts upon which the merits of Laudes' claim and this Court's jurisdiction may depend.

Respectfully submitted,

PLAINTIFF, LAUDES CORPORATION

By: /S/
Mark G. Jackson, WSBA #18325

GARVEY SCHUBERT BARER
1191 Second Avenue, Suite 1800
Seattle, Washington 98101
(206) 464-3939
(206) 464-0125 – fax

Counsel of Record for
LAUDES CORPORATION

July 17, 2008