IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| LAUDES CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | Case No. 1:08-cv-00121<br>(Judge Thomas C. Wheeler) |

PLAINTIFF'S CONSOLIDATED RESPONSE TO DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACTS AND PROPOSED FINDINGS OF UNCONTROVERTED FACTS

Plaintiff, Laudes Corporation ("Laudes") pursuant to Federal Court of Claims Rule 56(h)(2), and in support of its Objections in Opposition to the Defendant's Motion for Dismissal, or, in the Alternative, for Summary Judgment, and Alternative Motion for Continuance for Purposes of Discovery Pursuant to RCFC 56(f), filed on even date herewith, hereby respectfully submits the following Response to Defendant's Proposed Findings of Uncontroverted Facts, and Plaintiff's Proposed Findings of Uncontroverted Facts, each of which is consolidated into this document.

**I. *Response to Defendant's Proposed Findings of Uncontroverted Facts***

In response to the separately numbered paragraphs of Defendant's Proposed Findings of Uncontroverted Facts ("DPFUF"), Laudes hereby states as follows:

1. Laudes agrees that it entered into the contract referenced in this paragraph, and attached thereto as A1.

2. Laudes agrees that the referenced document bears the words set forth in Paragraph 2 of the DPFUF. Laudes further states that, although the contract was signed by and purports to identify Dr. Ziad Cattan of the Iraqi Ministry of Defense ("MOD") as the "contracting officer,"

for Contract USMI-04-CONTIGFOB-01, a U.S. Department of Defense Project and Contracting Office, Baghdad, Iraq ("PCO") memorandum demonstrates that United States Air Force Major Kenneth R. Caryer, of the PCO, was designated by PCO as Contracting Officer for the U.S. Government on Contract USMI-04-CONTIGFOB-01, and, in fact, exercised powers incident to that position. *See* Section II, *infra*, ¶ 10 & Laudes Appendix of Exhibits ("LA") LA-3 (PCO Memorandum appointing COR signed by Major Caryer as "Contracting Officer"). Laudes disagrees that Cattan was, in fact, "the contracting officer," and disagrees that PCO, in fact, acted or agreed to act, subject to his, or any MOD official's control, in respect of PCO's dealings with Laudes. Further, although the document states that payment will be made by the Iraqi MOD and identifies in block 25 Iraqi Ministry of Defense Authorized Funding, internal PCO communications indicate that officers of the PCO, in fact, had authority and exercised control over funding, budgeting and payment decisions, and that officials of the U.S. Department of State, including Patrick Marr, imposed a funding cap for the Fallujah camp effort and made decisions concerning payment of Laudes' invoices. *See, e.g.,* Section II, *infra*, ¶ 5 & LA-1 (E-mail exchange between Lt. Col. Hobson, PCO, and Col. Saul, Chief of Strategic Plans, MNF-I), and ¶¶ 19-21 & LA-5 & 6 (E-mails from TJ McLaren, PCO, re payment of Laudes invoices). For the reasons set forth here and below, Laudes disagrees that the MOD, in fact, had or exercised authority and/or control over funding and payment for Laudes' work on the Fallujah camp project.

3. Laudes agrees that the referenced document bears the words set forth in Paragraph 3 of the DPFUF. Laudes disagrees that PCO's "issuance" of the contract (which it did not sign), and an indication that PCO was to administer the contract, establish conclusively that the PCO acted as the agent of the MOD, for MOD's benefit, and subject to MOD's control, as regards the

dealings with Laudes that are the subject of Laudes' claim, and Laudes disagrees that the PCO, in fact, so acted. *See* Section II, *infra,* ¶¶ 5, 8, 10, 14, and 19-21 & LA-1 through LA-6.

4. Laudes agrees that the referenced document bears the words set forth in Paragraph 4 of the DPFUF. Laudes disagrees that the MOD, in fact, had or exercised authority and/or control over funding and payment for Laudes' work on the Fallujah camp project. *See*, *supra,* ¶ 2, and references therein.

## II. ***Laudes' Proposed Findings of Uncontroverted Facts***

Pursuant to RCFC 56(h)(2), Laudes hereby respectfully submits the following Laudes Proposed Findings of Uncontroverted Facts ("LPFUF"), which Laudes contends are not controverted by the DPFUF, or the single document filed by Defendant in support of its dispositive motion.

1. From and after September 2004, and at all times relevant to this case, the PCO (which became the Joint Contracting Command for Afghanistan and Iraq ("JCC") as of December 4, 2005) in Baghdad was (and is) an organization within the United States Department of Defense, and the contracting authority for the Multi-National Force, Iraq ("MFN-I," which was under U.S. Government command and control), tasked to provide acquisition and project management support. The PCO/JCC was (and is) staffed by U.S. Government officials, both military and civilian. The civilian and military contracting officers and representatives within the PCO with whom Laudes dealt were, at all times relevant hereto, authorized agents of the US Government. Laudes Complaint ("Comp.") at ¶ 15 (not disputed by Defendant).

2. To serve its political and operational goals, the United States Government wanted Iraqi forces to play a role in the battle to retake Fallujah. Iraqi Security Forces ("ISF") were to support United States Marine Corps forces, known as a Marine Expeditionary Force ("MEF") in

the fighting under the command of a Marine Corps general officer. The plan was for the ISF to take over security of the city at the conclusion of the operation. However, the ISF was not capable of functioning independently. The ISF had virtually no logistics capability to sustain or support its soldiers' participation in the planned operation. *Id.* ¶¶ 18-19 (not disputed by Defendant).

3. In or about mid-October, 2004, Lieutenant Colonel Mark Hobson, of the PCO, began working with United States Colonel David Saul, Chief of Strategic Plans, MFN-I, to define specifications for the provision of accommodations, related infrastructure, and life support services, to be delivered at a forward operating base near Fallujah, to support the participation of the ISF in the Fallujah operation. Neither the Interim Government of Iraq, Iraqi Ministry of Defence nor the ISF were involved in the process of preparing these contract specifications. *Id.* at ¶ 20 (not disputed by Defendant).

4. Eventually, on or about October 19, 2004, Colonels Hobson and Saul agreed on a Statement of Work ("SOW") for a contract effort that eventually became known as the East Fallujah Iraqi Camp, and referred to by the acronym, "EFIC." *Id.* at ¶ 21. (not disputed by Defendant).

5. Exhibit 1 to the Laudes Appendix attached hereto ("LA") is a compilation of true and correct copies of a series of e-mails in and about October 19, 2004, by and between Lt. Col. Hobson and Col. Saul, with copies to other U.S. military and government personnel, regarding the development of the specifications for the EFIC SOW effort. No Iraqi MOD or other Iraqi official is party to or copied on any of these e-mails. Col. Hobson described the EFIC effort as "***our*** number one priority," not the priority of the Iraqi MOD or Iraqi government. LA-1

(emphasis added). In addition to the scope of the work, these e-mails discuss funding and budgeting for the EFIC effort and contracting mechanisms. *Id.* In an e-mail from Col. Hobson to Col. Saul at 10:04 am, Hobson informs Saul that the growing scope of the EFIC requirement and anticipated costs would likely exceed $5 million, a threshold that "allows me to execute without advertising the requirement beyond getting three quotes." *Id.* The e-mails also suggest strongly that PCO and the U.S. State Department, not the Iraqi MOD, had and exercised control over budgeting and project funding: Hobson tells Saul: "I need to get a solid requirement from you on what you [sic] basic need is going to be and funding." Col. Saul's reply of 10:27 am addresses Col. Hobson's funding points. "I was under the impression that we budgeted the Iraqi $10m for a bde (5000) over three months. I am not expecting anything like that duration or cost here." At 5:06 pm, Hobson sent an e-mail to Saul asking: "any idea when we will have funding? We can begin some preliminary heads up with the contractors until funding is obtained." At 5:36 pm. Saul responded, saying "Patrick [meaning, Patrick Marr, of the United States State Department, who is copied on the e-mail at the address marrpm@state.gov] has the money trail sorted out." Hobson replied at 6:50 pm, and copied Marr: "I will get with Mr. Marr to iron out the funding so we can officially get this on the street. I assume Mr. Marr will be able to provide me the locations when I see him on the funding." LA-1.

6. Mr. T.J. McLaren, Senior Contracts Administrator, PCO Contracts Activity, acting for and on behalf of the PCO, requested Laudes to submit a proposal meeting the requirements of the EFIC SOW then under development by Cols. Hobson and Saul. McLaren's actions in this regard were undertaken with the knowledge, and under the direction and control, of Lieutenant Colonel Mark Hobson of the PCO. Comp. at ¶ 24. (not disputed by Defendant).

7. On October 19, 2004, at 7:35 am, Baghdad time, Mr. McLaren sent an email to Laudes informing it of the general nature of the requirements of "the Government" and asking Laudes to submit a "ROM" or Rough Order of Magnitude by 12:00 pm that same day. *Id.* at ¶ 25. (not disputed by Defendant).

8. The next day, on October 20, 2004 at 11:05 am, Mr. McLaren e-mailed Laudes the EFIC SOW. A true and correct copy of this e-mail is attached hereto in the Laudes Appendix as LA-2. There is no indication that the contracting party was to be the Iraqi Government, which had no involvement in the acquisition to that point. Comp., at ¶ 27. This e-mail was sent by an official of the PCO, an instrumentality of the U.S. Department of Defense, and makes multiple references to desires and needs of "***the Government***," but none to the Iraqi MOD or Iraqi Interim Authority. LA-2 (emphasis added). In this e-mail, PCO official McClaren emphasized, in all capital letters: "IT SHOULD BE UNDERSTOOD THAT THERE IS NO GREATER IMPORTANCE TODAY IN ANYONES [sic] WORK WORLD THAT IS MORE IMPORTANT THAN THIS REQUIREMENT. PLEASE PRICE AND PLAN ACCORDINGLY." *Id.*

9. Due to its work on other projects, Laudes did not initially want to make an offer on the contract, however, PCO officials, including Mr. McLaren and Lt. Col. Hobson, prevailed upon Laudes to submit an offer and undertake the work. In an effort to please the PCO and support an important U.S. operation, Laudes submitted a quote to the PCO on October 21, 2004 for $15,542,179.60. Laudes' offer was immediately accepted by the PCO on October 21, 2004, within hours of its submission, and Laudes immediately began performing. Comp., at ¶¶ 28-30 (not disputed by Defendant).

10. By memorandum dated November 1, 2004, making specific reference to the Laudes EFIC contract by contract number USMI-04-CONTIGFOB-01, US Air Force Major Kenneth R. Caryer, expressly acting as Contracting Officer under that contract for the PCO and expressly exercising authority under DFARS 201.602, appointed U.S. Marine Major Mark Conway as the Contracting Officer's Representative for the referenced contract. A true and correct copy of this memorandum is included in Laudes' Appendix, at LA-3. This appointment was not signed by Dr. Cattan, or any other Iraqi MOD official. LA-3.

11. PCO officials exercised complete control, with no input or decision-making from any Iraqi official, concerning contract requirements or terms, source selection, contract administration, changes, contractor performance, or contract close-out. Laudes took direction daily regarding contract performance, invoicing and changes chiefly from Lt. Col. Hobson and McLaren as well as other PCO officials. Additional direction was provided by the contracting officer's representative ("COR"), Marine Major Scott Conway (appointed as such by Lt. Col. Hobson, pursuant to the memorandum attached as LA-3), on the smallest details of the contract such as the time of convoy departures, the condition of porta-potties and tents, the amount of water and the quantity of supplies. Additionally, Marine Major Keith McVeigh also provided regular direction equivalent to that of Major Conway. PCO officials and their representatives at EFIC verbally directed Laudes to undertake many tasks not set forth in the SOW without any notification to or input from the MOD. These changes did not result in formal written contract modifications. PCO officials directed all aspects of contract administration to include directing Laudes to do whatever was necessary to make the contract a success. Comp., at ¶¶ 31-34 (not disputed by Defendant).

12. Shortly after agreeing to the EFIC contract, a Laudes subcontractor declined to provide services because of concerns about the publicity and security surrounding the Fallujah project. Shortly thereafter, a replacement subcontractor began working for Laudes, and its owner's son was kidnapped. As a result, that subcontractor stopped performing in Fallujah and the subcontract was terminated. A third company was hired, and subsequently terminated because of substandard performance. A fourth company was hired, at the specific direction of PCO official McLaren, and was eventually able to perform with intense guidance and direction from Laudes personnel. Comp., at ¶ 35 (not disputed by Defendant).

13. Operations surrounding the Fallujah project were very difficult, costly and time-consuming. Security was a constant problem. Nearly half of every day was spent trying to get through checkpoints, even though the distance was only about 70 kilometers from Baghdad. All vehicles entering or departing EFIC required convoy protection, which had to be constantly arranged for with MEF personnel. The camp site was repeatedly attacked by insurgents. Iraqi forces routinely destroyed, pilfered and stripped equipment such as shower heads and acted in other destructive ways. Once ISF began to occupy EFIC, members of the Iraqi forces used violence and intimidation against Laudes' workers. ISF personnel at the Fallujah camp routinely threatened, harassed, and attacked Laudes workers. One incident occurred while Lt. Col. Hobson was on site doing a walk-through. One Laudes worker had his arm broken and another was forced to the ground with a weapon to his head. Laudes communicated these concerns to MNF and PCO officials, who expressly authorized and directed Laudes to hire a security subcontractor, and in fact, identified and recommended the contractor Laudes ultimately hired -- EODT. Comp. at ¶¶ 36-39 (not disputed by Defendant).

14. Attached to Laudes' Appendix, as Exhibit LA-4, are true and correct copies of e-

mails between McLaren and Laudes' President, Larry Underwood, dated November 15, 2004, regarding the security situation that led to engagement of the security subcontractor. McLaren's e-mail to Mr. Underwood again refers to PCO as "the Government," and McLaren's role on behalf thereof, in a manner suggesting that McLaren understood that term to mean the PCO and Multinational Force Iraq, both instrumentalities of the U.S. Government:

> ***The Government*** must be assured of the success of its funded projects; ***as the contracts administrator on this effort, and appointed representative to your company and the MFNI***, I need to be informed of all decisions that may or may not affect the success of this [Forward Operating Base] mission.
>
> Information learned will be immediately passed up to the ***Government leadership chain of command, both in PCO and MNFI***.
>
> Please make sure I am in your meeting. TJ

LA-4 (emphasis added). Conspicuously absent from this e-mail is any reference to MOD or the Iraqi government, much less any indication that McLaren's actions were subject to their control and authority. When he refers to PCO and MBNF-I in reference to the "Government chain of command," McLaren makes it clear that his references to "the Government" mean the U.S. Government, not the Iraqi MOD.

15. PCO officials recognized and agreed that hiring a security subcontractor resulted in compensable costs for Laudes that would increase the overall cost of the contract. PCO officials repeatedly stated orally that Laudes would get paid for hiring EODT and that there would be a written contract modification issued to memorialize the oral promises. Despite their promises, PCO officials never followed up with a written modification. Comp. at ¶¶ 39-40 (not disputed by Defendant).

16. Laudes performed work on the EFIC project from on or about October 21, 2004 until or about December 23, 2004. It submitted its final invoice to the PCO for $18,463,953.60 on

December 23, 2004. This amount was only $2,921,744 more than its quote. The difference results entirely from Laudes' hiring the security firm of EODT at the express direction of PCO to protect Laudes' workers from the Iraqi troops they were supporting. *Id.* at ¶ 42 (not disputed by Defendant).

17. Naturally, given the chaos in Iraq and the limited functionality and responsibility of the Iraqi government, Laudes had concerns about receiving payment from the MOD. To allay Laudes' concerns, as an inducement to sign the contract, PCO officials, including, without limitation, Mr. McLaren and Lt. Col. Hobson, repeatedly orally assured Laudes that it would receive payment for its work because the PCO would facilitate and obtain payment for Laudes from the MOD. Defs. Motion, at 2 & n. 2 (admitting, for purposes of Defendant's motion to dismiss/for summary judgment, that such promises were made). PCO officials made similar promises and undertakings to facilitate and obtain payment to Laudes during the course of Laudes' performance of the contract, including, without limitation, in connection with Laudes' engagement of the security subcontractor, EODT. *Id.*

18. But for promises on the part of PCO officials to facilitate and obtain payment, Laudes would not have signed the contract or continued performance. But for these promises to facilitate and obtain payment, Laudes would not have agreed to perform additional and changed work that varied from the EFIC SOW. But for these promises to facilitate and obtain payment for the work to be performed by subcontractors, including the security subcontractor, EODT, Laudes would not have engaged and paid subcontractors. Comp. at ¶ 45, 47 (not disputed by Defendant).

19. PCO officials' actions before, during and immediately after performance, indicate

that they believed and understood that PCO had an obligation to authorize and obtain payment for Laudes. This understanding was manifested in a clear and detailed form when Laudes sought payment on its final invoice. *Id.* at ¶ 50 (not disputed by Defendant). Attached to Laudes' Appendix, as Exhibit LA-5, is a true and correct copy of an e-mail between McLaren and Laudes, dated January 2, 2005. In it, McLaren wrote:

> The PCO contracts shop is very much part of the East Fallujah Camp Agreement (EFIC); one of our remaining responsibilities under our arrangement with our MOD contract brethren is [sic] ensure that your firm is paid timely and without delay by the MOD budget office after receiving your firm's final invoice. PCO initiated dialogue with Laudes on this very matter two weeks ago. The contentious nature of payment between Prime contractor and subcontractor, on a Military Base that is contractually administered by our PCO office, has now placed our office in [sic] slightly different role than was originally anticipated by the leadership of PCO and MOD; the inability of Laudes to definitize the remaining subcontractor invoice(s) on the Prime contract has now permitted the PCO contract shop to assume direct authority over the payment process concerning this contract.
>
> PCO will allow both parties involved, two (2) more days to settle the issues between your respective companies before PCO renders a final decision for both parties as to their final billing(s).
>
> ***In addition, PCO contracts will ensure fair payment of the monies owed once payment from MOD is seen as impending***. In the extreme that Laudes Corporation and AISG [subcontractor] cannot find a solution, PCO will provide the opportunity to have each contractor separately bill their PCO approved invoices to the MOD separately. ***Under this approach, PCO assumes direct authority over the process of payment and the responsibility of deficiencies, if any, concerning, concerning any lingering details of the ongoing EFIC operation.***
>
> Please do not make the mistake or be confused in anyway that PCO is anything other than deeply involved in the EFIC agreements, including all subcontractor complaints, constraints or complements of any kind.

LA-5, (emphases added).

20. In another e-mail from McLaren to another PCO official (*see* LA-6, *infra*) McLaren describes as an "end run" around PCO, Laudes Comptroller Sandy Ellis' resort to traveling to the MOD herself and demanding payment from the Iraqi Government, which had had no

involvement with the contract since its inception. After several days of efforts, the MOD made a partial payment to Laudes of $8,003,346.00. Laudes only sought a partial payment at the time because it had not yet received all invoices from its subcontractors and paid those, which it wanted to do before seeking full payment on the contract. To reinforce that a balance would remain on the contract after payment of the $8,003,346.00, Laudes' invoice was clearly marked as a request for partial payment. Comp. at ¶ 54 (not disputed by Defendant).

21. That internal PCO e-mail, attached to Laudes' Appendix as Exhibit LA-6, from McLaren to James R. Bachinsky, baldly states:

> ***EFIC [FUNDING] HAS ALREADY BEEN CAPPED BY STATE DEPARTMENT, CURTISY [sic] OF MR. PATRICK MARR***. . . .LT. COL. HOBSON INITIALLY GAVE THEM [Laudes] THE BOOT, THEN EXPLAINED TO THEM WHY HE WASN'T GOING TO PAY THEM THE REMAINING $8 MILLION. SANDY TRIED TO PULL AN END AROUND AND TOOK THE INVOICE DIRECTLY TO THE MOD INSTEAD. DR ZAIAD [sic] AND SECRETARY GENERAL BRUSKA HAND WALKED THE LAUDES INVOICE DOWN TO BRITISH/COALITION MOD REPRESENTATIVE ***AND HE THEN GAVE IT TO MR. MARR. . . .***

LA-6 (emphasis added).

PCO officials failed to inform Laudes that the United States State Department had "capped" funding for the EFIC contract at an amount far below even the face amount of the contract, and that officials of the U.S. Government, not the MOD, exercised authority over funding for the EFIC effort and payment for. Laudes believes that PCO officials were aware of these facts even as they were directing Laudes to continue to perform, resolve disputes with subcontractors, and/or submit final invoices to PCO for payment. Comp. at ¶ 55 (not disputed by Defendant).

Respectfully submitted,

LAUDES CORPORATION

By:__________/s/__________

Mark G. Jackson, WSBA #18325

GARVEY SCHUBERT BARER
1191 Second Avenue, Suite 1800
Seattle, Washington 98101
(206) 464-3939
(206) 464-0125 – fax

Counsel of Record for
LAUDES CORPORATION

July 17, 2008