Supplemental Appendix

Laudes's CDA Claim

**Cognizant Contracting Officer**
**Headquarters Joint Contracting Command**
**Afghanistan and Iraq**
**APO AE 09348-1400**
**Baghdad, Iraq**

**RE: LAUDES CORPORATION – CERTIFIED CLAIM FOR BREACH OF CONTRACT AND EQUITABLE ADJUSTMENT: CONTRACT NO. USMI-04-CONTIGFOB-01**

Dear Cognizant Contracting Officer:

On behalf of our client, Laudes Corporation ("Laudes"), we hereby respectfully submit the following claims arising under the Contracts Disputes Act, 41 USC. § 602(a)(2), which are certified below by the President of Laudes in accordance with 41 USC § 605(c)(1). The claims arise from and relate to services provided for the direct use or benefit of the US Government under Contract No. USMI-04-CONTIGFOB-01, awarded to Laudes by and/or at the direction of the Project and Contracting Office, Multinational Force, Iraq ("PCO"), on or about October 21, 2004 (the "Contract").

## I. *Introduction and Summary*

As set forth in detail below, during the period between October 2004 and December 2004, Laudes performed its obligations under the Contract by providing accommodations, related infrastructure, and life support services at a forward operating base near Fallujah, Iraq, to benefit the US Government in pursuit of its political and military goals of having Iraqi forces, under the command and control of a general officer of the United States Marine Corps, participate with US forces in the battle to retake Fallujah from insurgent forces in late 2004. Laudes provided such services at the request of and for the direct benefit of the US Government, at all times acting at and under the express direction and control of PCO personnel, whose

assigned duties included entering into binding contractual obligations for and on behalf of the US Government, and in reliance on their assurances of payment. Due to dangerous, unanticipated, difficult and constantly-changing conditions during the course of performance, again, at the express direction of PCO officials and in reliance on their assurances of payment, Laudes performed additional and changed work beyond that required by the original Contract specifications, including engaging and paying in full an additional subcontractor to provide security, which subcontractor the PCO selected and directed Laudes to hire. Despite performing the work specified in the Contract and changed and/or additional work as directed by the PCO, Laudes received only $8,003,346.00 of the original Contract fixed price of $15,542,179.60, and nothing for the $2,921,806 in additional costs Laudes incurred in paying in full the security subcontractor it engaged and paid at the express direction of PCO officials. When a customary 10% overhead rate and 10% profit rate are applied to the EODT subcontract costs, the adjustment amount rises to $3,506,167.20.

By the claims set forth herein, Laudes seeks to recover a sum certain in the amount of $11,516,829.30, which includes the following specific relief: (1) payment of the $7,538,833.60 balance of the original Contract price; (2) equitable adjustment of the Contract price equal to $3,506,167.20, the costs, overhead and profit that Laudes incurred in engaging and paying in full a security team at the direction of the PCO, which amounted to a change in the Contract scope of work; (3) payment of the $3,506,167.20 for engaging the security team, which PCO officials authorized to bind the Government directed Laudes to hire with the mutual understanding and intent of the parties that Laudes would be compensated for such costs; (4) and accrued interest on the foregoing sums as provided by the Prompt Payment Act, in the amount of $471,828.50.[1]

[1] This is the Prompt Payment Act interest owed for one year on the amount invoiced to the PCO on January 4, 2005, which was $10,460,607.60.

In addition to the foregoing, Laudes requests accrued post-claim submission interest as provided by the Contracts Disputes Act, in an amount to be established.

Laudes hereby requests a final decision by the cognizant Contracting Officer on these claims.

## II. ***Background***

### A. ***Status of US Government and PCO in Iraq in Late 2004***

In March 2003, the United States invaded Iraq, deposed Saddam Hussein from power and became an occupying power over Iraqi territory under the law of war in accordance with the Hague and Geneva Conventions. In early May 2003, the United States announced the creation of the Coalition Provisional Authority (CPA). According to President Bush, the CPA was created under the law of war to exercise powers of the Iraqi government temporarily and to provide for security in Iraq. On May 6, 2003, President Bush, in an executive action, appointed Ambassador L. Paul Bremer to serve as the Presidential Envoy to Iraq and directed that Ambassador Bremer report to Secretary of Defense Donald Rumsfeld.

According to Ambassador Bremer's letter of appointment:

> Subject to the authority, direction, and control of the Secretary of Defense, you are authorized to oversee, direct, and coordinate all United States Government (USG) programs and activities in Iraq, except those under the command of the Commander, US Central Command.

In a June 2003 report to Congress, the U. S. Office of Management and Budget described the duties of the Administrator and the CPA as follows:

> The administrator of the Coalition Provisional Authority (CPA) reports to the President through the Secretary of Defense. . . . The CPA is vested by the President with all executive, legislative and judicial authority necessary to achieve its objectives, exercised consistent with relevant U. N. Security Council resolutions.

Congress, in the fiscal year 2004 emergency supplemental appropriation stated that the CPA was "an entity of the United States Government." On May 11, 2004, President Bush signed National Security Policy Directive 36 (NSPD-36), preparing to effect a transfer of some, but not all, of the CPA's authority and powers to an Interim Iraqi Government ("IIG"). The directive provided, in pertinent part:

> When the CPA is terminated, the United States will be represented in Iraq by a Chief of Mission, who on my behalf and under the guidance of the Secretary of State, shall be responsible for the direction, coordination and supervision of all United States Government employees, policies, and activities in country, except those under the command of an area military commander, and employees seconded to an International Organization.
>
> Commander, USCENTCOM [US Central Command], under the authority, direction, and control of the Secretary of Defense, shall continue to be responsible for US efforts with respect to security and military operations in Iraq. . . .
>
> Commander, USCENTCOM, with the policy guidance of the Chief of Mission, shall direct all United States Government efforts and coordinate international efforts in support of organizing, equipping, and training all Iraqi security forces.

* * *

In order to implement NSPD-36, the US Department of Defense created the Multinational Security Transition Command-Iraq (MNSTC-I) under the overall direction of Commander, Multinational Force-Iraq (MNF-I). Transfer of authority to the IIG on June 28, 2004, did not result in complete sovereignty for the IIG. Nor was it intended to produce that result. By separate letters, both dated June 5, 2004, US Secretary of State Colin Powell and Dr. Ayad Allawi, Prime Minister of the IIG, disclosed to the United Nations Security Council agreed upon limitations and/or exceptions to the IIG's authority, copies of those letters are attached hereto as Exhibit A.

Specifically, according to the agreement reflected in the Powell/Allawi letters, Iraqi security forces would fall under operational command of the MNF-I during military operations in order to achieve unity of command. Further, the MNF-I, under US Government command and control, undertook a broad range of tasks to contribute to the maintenance of security, to ensure force protection, and to train and equip Iraqi security forces. Secretary Powell's letter specifically confirms that responsibility and authority over training and equipping Iraqi security forces was reserved to MNF-I, and not the IIG or its Ministry of Defence, in his description of the tasks to be performed by the MNF-I after turnover:

> Under the agreed arrangement, the MNF stands ready to continue to undertake a broad range of tasks to contribute to the maintenance of security and to ensure force protection. These include activities necessary to counter ongoing security threats posed by forces seeking to influence Iraq's political future through violence. This will include combat operations against members of these groups, internment where this is necessary for imperative reasons of security and the continued search for and securing of weapons that threaten Iraq's security. *A further objective will be to train and equip Iraqi security forces that will increasingly take responsibility for maintaining Iraq's security.*

On June 8, 2004, the United Nations Security Council issued Resolution 1546 which, among other things, declared that the MNF "shall have the authority to take all necessary measures to contribute to the maintenance of security and stability in Iraq in accordance with the [letters from Secretary Powell and Prime Minister Allawi] annexed to this resolution...."

In furtherance of MNF-I's core mission, President Bush in NSPD-36 further provided:

> I also establish . . . a temporary organization within the Department of Defense to be called the Project and Contracting office (PCO) to provide acquisition and project management support with respect to activities in Iraq, as requested by the Secretary of State and heads of other Departments and agencies. The Secretary of Defense in consultation with the Secretary of State shall select a Director for PCO. PCO personnel in Iraq shall be permanently or

> temporarily assigned under Chief of Mission authority. PCO shall provide acquisition and project management support to the Chief of Mission. . . . The Director of the Office of Management and Budget shall ensure that future budget submissions request the funding and authorities I determine necessary to support the US Mission in Iraq.

From and after September 2004, and at all times relevant hereto, the PCO (which became the Joint Contracting Command for Afghanistan and Iraq ("JCC") as of December 4, 2005) in Baghdad was (and is) an organization within the United States Department of Defense, and the contracting authority of MNSTC-I and MNF-I, tasked to provide acquisition and project management support. The PCO/JCC was (and is) staffed by US Government officials, both military and civilian. The contracting officers and contracting representatives within both the PCO and the JCC are authorized agents of the US Government. The PCO was staffed by US Government officials and contractors, both military and civilian. The civilian and military contracting officers and representatives within the PCO with whom Laudes dealt were, at all times relevant hereto, authorized agents of the US Government.

**B. *The Fallujah Contract***

In or around October 2004, the MNF-I believed that the city of Fallujah, about 70 km to the west of Baghdad, in the heart of what is known as the "Sunni Triangle," where the population was more hostile to the USG occupation than other parts of the country, had become a haven for terrorists staging attacks on MNF-I forces. Fallujah gained notoriety in March 2004 when terrorists attacked a convoy of trucks driven by contractor personnel, killed the drivers and mutilated their bodies and displayed the bodies prominently. The incident received considerable media attention. In October 2004, the US Government began the final preparations for what would become known as the Second Battle of Fallujah and was officially named "Operation Phantom Fury." The goal of the operation was to extricate terrorists from Fallujah. Moreover,

MNF-I forces believed that the insurgent leader, Abu Musad Al-Zarqawi, and thousands of his fighters had taken refuge within the city. This circumstance seriously challenged the US Government forces' attempts to subdue the insurgency, which presented a threat to both the US Government occupying forces and to the security of the people of Iraq because insurgent attacks targeted both the military and civilian targets.

For political and operational reasons, the USG wanted Iraqi forces to play a role in the battle to retake Fallujah. Iraqi Security Forces ("ISF") were to support United States Marine Corps forces, known as a Marine Expeditionary Force ("MEF") in the fighting under the command of a Marine Corps general officer. The plan was for the ISF to take over security of the city at the conclusion of the operation. However the ISF was not capable of functioning independently. The ISF had virtually no logistics capability to sustain or support its soldiers' participation in the planned operation.

In furtherance of the MNF-I's military and political objectives, to provide for the security of the Iraqi people, and as part of executing its undertaking to train, support and equip friendly Iraqi forces to participate in the battle to retake Fallujah, in or about mid-October, 2004, Lieutenant Colonel Mark Hobson, of the PCO, began working with Colonel David Saul, Chief of Strategic Plans, MNF-I, to define contract specifications for the provision of accommodations, related infrastructure, and life support services, to be delivered at a forward operating base near Fallujah, to support the participation of the ISF in the Fallujah operation. The IIG Ministry of Defence or ISF were not involved in the process of defining these contract specifications. Eventually, on or about October 19, 2004, Colonels Hobson and Saul agreed on a Statement of Work ("SOW") for a contract that eventually became known as the East Fallujah Iraqi Camp, and referred to by the acronym, "EFIC."

Laudes performed under a number of contracts in support of USG military operations and reconstruction efforts in Iraq from 2003 through 2005. Laudes provided essential support to the USG's efforts to stabilize Iraq in the midst of a growing insurgency. For example, it built the Baghdad Police Services Academy ("BPSA") and it provided life support services at a number of Forward Operating Bases ("FOBs"). In this work, Laudes built and sustained military camps. This involved building and maintaining living quarters, dining facilities, toilets and showers oftentimes from a "bare base" or near "bare base" starting point requiring implementation of electrical generators and systems for providing water and fuel as well as for providing for security. Operating conditions in Iraq during 2004 were extremely difficult. In addition, requirements changed almost daily as dictated by the mission, policies and as the security status changed and evolved. Nevertheless, Laudes provided results for the MFN-I and gained a reputation within the PCO as the "go to" contractor for life support services in Iraq.

Mr. T. J. McLaren, Senior Contracts Administrator, PCO Contracts Activity, acting for and on behalf of the PCO, requested that Laudes submit a proposal meeting the requirements EFIC SOW developed by PCO. Mr. McLaren's actions in this regard were undertaken with the knowledge, and under the direction and control, of Lieutenant Colonel Mark Hobson of the PCO.

On October 20, 2004, at 7:35 am, Baghdad time, Mr. McLaren sent an email to Laudes informing it of the general nature of the requirements of "the Government" and asking Laudes to submit a "ROM" or Rough Order of Magnitude by 12:00 pm that same day. In this email, McLaren did not indicate that the contract would be for the IIG Ministry of Defence or any instrumentality of the IIG. In fact, every indication in the e-mail is that the contract was solicited by the PCO itself. Later, Mr. McLaren emailed Laudes the EFIC SOW for the contract as developed by Colonels Hobson of the PCO and Saul, of MFN-I. A copy of the relevant email is

attached hereto as Exhibit B. These documents reflected the expedited nature of the contract formation in that they only set forth the general nature of the expectations of the contractor. The contract terms indicate, obtusely, that the contract would be paid with Iraqi Government funds, but there is no indication that the contract was to be with the Iraqi Government, which had no involvement in the acquisition to that point.

Due to its work on other projects, Laudes did not initially want to make an offer on the contract, however, PCO officials, including Mr. McLaren and LTC Hobson, prevailed upon Laudes to submit an offer and undertake the work, telling Laudes personnel that the Fallujah camp was among the highest priorities of the PCO at the time. In an effort to please the PCO and support an important US operation, Laudes submitted a quote to the PCO on October 21, 2004 for $15,542,179.60, a copy of which is attached hereto as Exhibit C. Laudes' offer was immediately accepted by the PCO on October 21, 2004; within hours of its submission.

Later that day Ms. Sandra Ellis, the comptroller for Laudes signed the contract alongside Dr. Zaid Cattan, who purported to sign the contract on behalf of the Ministry of Defence of Iraq as "the contracting officer." The contract was signed on a Standard Form 1449, published by the General Services Administration, the form used by USG agencies for commercial items contract actions, and given a MNF-I contract number – USMI-04-CONTIGFOB-01. Mr. McLaren was listed as the contract administrator, and the contract explicitly stated that it was issued by the "PCO CONTRACTING ACTIVITY." The contract expressly provided "net 30 day" payment terms.

Though he signed for the MOD as "contracting officer," signing the contract was the extent of Dr. Cattan's involvement with contract formation and administration. On information and belief, Dr. Cattan signed the contract at the direction of the PCO. A true and correct copy of

the contract (including the SOW) is attached hereto as Exhibit D. Dr. Cattan later left the MOD and fled Iraq, accused of misappropriating $800,000,000 in MOD funds. He is now living in Poland and was convicted in absentia by an Iraqi court and sentenced to 60 years for misuse of public funds. Upon signing the contract, Laudes immediately began preparations to perform.

Though an MOD official signed the contract, no such signature was necessary for the US Government to expend Iraqi funds. In accordance with the Hague Convention IV of 1907, Geneva Convention IV of 1949, Additional Protocol I of 1977, UN Security Council Resolution 1483, and customary international law, the US Government, as an occupying power, had legal authority to spend Iraqi funds. Despite the asserted hand-over of sovereignty to the IIG on June 28, 2004, the IIG did not, in fact, function as a non-occupied nation. This is clearly demonstrated by both UNSCR 1546 and NSPD 36, which delineated clear areas of retained authority by the US Government, the underlying legal authority for which arose from US Government's status as an occupying power. Thus, insofar as the US Government acted in accordance with its stated powers and those arising independently from international law, which included maintaining the security of the Iraqi people and training ISF, it needed no authority from the IIG to expend Iraqi funds. Accordingly, the contract signed by Laudes was a contract directly with the US Government regardless of whose signature appears on the Contract.

### C. *PCO Directs All Aspects of Performance and Administration; Including Engagement of Security Team*

By memorandum dated November 1, 2004, making specific reference to the Contract by contract number USMI-04-CONTIGFOB-01, US Air Force Major Kenneth R. Caryer, acting as Contracting Officer under the Contract for the PCO and expressly exercising authority under DFARS 201.602, appointed US Marine Major Mark Conway as the Contracting Officer's Representative for the Contract. A true and correct copy of this memorandum is attached hereto

as Exhibit E. PCO officials exercised complete control, with no input or decision-making from any Iraqi official concerning contract requirements or terms, source selection, contract administration, changes, contractor performance, or contract close-out. For instance, Mr. McLaren was actively involved in arranging subcontractors for Laudes. He actively sought out and recommended subcontractors to Laudes based on his personal contacts. He even offered to negotiate terms with recommended subcontractors.

The PCO personnel with whom Laudes dealt in submitting a bid on and performing the Contract had the authority to solicit bids and bind the US Government contractually. Authority to bind the US Government contractually was an integral part of the assigned duties of such PCO officials, and appropriate or essential to the performance of their duties. Alternatively, authorized PCO officials were aware of these actions and accepted them, never directing the PCO personnel to cease making them.

Laudes eventually ended up hiring three subcontractors, all based on arrangements made by Mr. McLaren: EODT for security, AISG for laborers, and Sofia (a United States based company) for portable toilets. Laudes had performance issues with all three contractors recommended by Mr. McLaren. Despite these performance issues, Laudes paid all subcontractors in full before it sought payment on the Contract. This failure to be paid resulted in a significant financial hardship, which was compounded by Laudes' bearing the full amount of all up-front mobilization costs.

Laudes took direction daily regarding contract performance, invoicing and changes chiefly from LTC Hobson and Mr. McLaren as well as other PCO officials. Additional direction was provided by the PCO Contracting Officer's Representative ("COR"), Marine Major Scott Conway, on the smallest details of the contract such as the time of convoy departures, the

condition of porta-potties and tents, the amount of water and the quantity of supplies. Additionally, Marine Major Keith McVeigh also provided regular direction equivalent to that of Major Conway.

PCO officials and their representatives at EFIC verbally directed Laudes to undertake many tasks not set forth in the SOW without any notification to or input from the MOD. These changes did not result in formal written contract modifications. PCO officials directed all aspects of contract administration to include directing Laudes to do whatever was necessary to make the contract a success.

Shortly after agreeing to the EFIC contract, a Laudes subcontractor declined to provide services because of concerns about the publicity and security surrounding the Fallujah project. Shortly thereafter, a replacement subcontractor began working for Laudes, and the owner's son was kidnapped. As a result, that subcontractor stopped performing in Fallujah and the subcontract was terminated. A third company was hired, and subsequently terminated because of substandard performance. A fourth company was hired, at the specific direction of PCO official McLaren, and was eventually able to perform with intense guidance and direction from Laudes personnel.

Operations surrounding the Fallujah project were very difficult, costly and time-consuming. Security was a constant problem. Nearly half of every day was spent trying to get through checkpoints, even though the distance was only about 70 kilometers from Baghdad. All vehicles entering or departing EFIC required convoy protection, which had to be constantly arranged for with MEF personnel.

The camp site was repeatedly attacked by insurgents. Iraqi forces routinely destroyed, pilfered and stripped equipment such as shower heads and acted in other destructive ways.

Once ISF began to occupy EFIC, members of the Iraqi forces used violence and intimidation against Laudes' workers. ISF personnel at the Fallujah camp routinely threatened, harassed, and attacked Laudes workers. One incident occurred while LTC Hobson was on site doing a walk-through. One Laudes worker had his arm broken and another was forced to the ground with a weapon to his head.

Laudes communicated these concerns to MNF-I and PCO officials, who expressly authorized and directed Laudes to hire a security team, and in fact, identified and recommended the contractor Laudes ultimately hired -- EODT. *See* Exhibit F (emails between PCO and Laudes on hiring of EODT). PCO officials recognized and agreed that hiring a security sub-contractor resulted in compensable costs for Laudes that would increase the overall cost of the contract. *Id.*

PCO officials, and specifically Mr. McLaren, repeatedly stated orally that Laudes would get paid for hiring EODT and that there would be a written contract modification issued to memorialize the oral promises. Despite their promises, PCO officials never followed up with a written modification.

The PCO officials who directed Laudes to perform additional and changed work and to engage a security subcontractor had the authority to order such work and to bind the US Government to modifications of the contract and to pay for such work. Authority to bind the US Government contractually was an integral part of the assigned duties of such PCO officials, and appropriate or essential to the performance of their duties. To the extent that Mr. McLaren or other applicable PCO officials exceeded the scope of their authority, they were acting under implied actual authority. Alternatively, the PCO Contracting Officer and/or LTC Hobson, a

warranted contracting officer, was aware of these actions and accepted them, never disaffirming them and never directing the PCO officials to cease making them.

Laudes performed on the contract from on or about October 21, 2004 until or about December 23, 2004. It submitted its final invoice to the PCO for $18,463,953.60 on December 23, 2004. This amount was only $2,921,744 more than Laudes' quote and did not even reflect overhead and profit on those costs. A true and correct copy of Laudes' final invoice is attached hereto as Exhibit G. The difference results entirely from Laudes' hiring the security firm of EODT at the express direction of PCO to protect Laudes' workers from the Iraqi troops they were supporting even though Laudes experienced a number of events beyond its control and SOW changes that then drove up its costs.

The invoice was not paid within 30 days of submission of the final invoice, as the Contract required. Laudes received a partial payment of $8,003,346.00 from the MOD. *See* Exhibit G, showing credit for partial payment. Subsequently, Laudes submitted additional invoices to the PCO and the US Embassy, which have not been paid.

Neither Dr. Cattan (the purported signatory of the contract) nor any MOD official had any involvement in the decision to close out the Laudes contract, or in resolving invoice documentation and other issues involving Laudes subcontractors after contract closeout. PCO assumed and exercised direct authority and control over those processes. In December 2004, Ms. Ellis hand delivered an invoice for partial payment, for about $8 million. At the direction of PCO and Mr. Marr of the US State Department who worked closely with the PCO, Dr. Cattan authorized payment of this invoice. Later, Dr. Cattan received several times final invoices from Laudes. Dr. Cattan turned the first of these over to Mr. Marr, who would not authorize payment of the final invoices, explaining that there were no more DFI funds in the budget for the Fallujah

camp. Also, Dr. Cattan was told by LTC Hobson and PCO that Laudes' final invoice should not be paid, because, according to them, the work had not been completed. Because neither Dr. Cattan, nor anyone in the MOD supervised the work or administered the contract, no MOD official had any personal knowledge of whether or not this was true.

## III. *Claims*

### A. ***Breach of Contract: Failure to Pay Balance of Contract Price***

The elements of a valid contract with the US Government are: (1) mutuality of intent; (2) consideration; (3) unambiguous offer and acceptance; and (4) the actual authority – express or implied – of the official upon whose conduct the contractor relies, to bind the US Government in contract. *Stevens Van Lines* v. *US,* Case No. 05-1278 (Fed. Cir. January 23, 2008).

PCO and MNF-I officials established the Contract SOW, and PCO officials expressly solicited a bid from Laudes for the work described in the SOW. Laudes was reluctant to respond to the solicitation, and was induced to do so by PCO by various assurances and promises from PCO officials, including assurances that Laudes would be paid the price it quoted for the Contract work. Laudes responded with a bid and a price quote, and PCO officials accepted the bid by selecting Laudes to perform the work. PCO intended to induce Laudes to bid on, enter into and perform the work described in the Contract. Manifesting mutuality of intent, Laudes accepted the Contract, performed its obligations thereunder, and also accepted directions from PCO officials for changed and additional work and engaged and paid subcontractors in accordance with those directions. Were it not for the foregoing offer, undertakings, and promises by PCO, bolstered by the faith and credit of the US Government, Laudes would not have entered into the Contract, accepted directions for changed and additional work or engaged and paid subcontractors in accordance with those directions.

For their part, PCO officials' actions before, during and immediately after performance, indicate that they shared Laudes belief and understanding that PCO had the authority to control all aspects of the Contract, and an obligation to assure that Laudes was paid. Two United States military Colonels, not any officer or official of the IIG MOD, drafted and defined the Contract SOW. PCO officials, including LTC Hobson, acting for, with the knowledge of, and at the direction of authorized MFN-I officials, solicited a bid from Laudes, and selected Laudes to perform the Contract.

Although the Contract purported to designate Dr. Cattan as "contracting officer," the PCO nonetheless designated US Air Force Major Kenneth Caryer as Contracting Officer, who, in turn, expressly exercising authority conferred upon him by the US DFARS, appointed US Marine Major Conway as the Contracting Officers' Representative. To the extent that an official of the MOD purported to sign the contract on behalf of the IIG MOD, as "contracting officer," he did so, on information and belief, at the direction and acting under the control of the PCO and/or MNF-I. Throughout Laudes' performance on the Contract, neither Dr. Cattan, nor any other IIG MOD officer or official, exercised any contract administration authority or directed Laudes' performance. The PCO exercised functions inherent to a principal authorized to bind the US Government, rather than an agent of IIG MOD in material respects, including, but not limited to: establishing the contract requirements and terms, making the source selection, directing engagement and arranging subcontractors, requiring work outside the SOW without formal modification to the contract, and making the decision to close out the contract.

As to payment, the PCO assumed direct authority, responsibility and control over the payment process, told Laudes so, and Laudes relied on such authority, responsibility and control in performing the contract. For instance, during performance, Mr. McLaren of the PCO

Contracting Activity wrote to Laudes, stating that "the Government [meaning the PCO and MNF-I] must be assured of the success of its funded projects." A copy of an email supporting this assertion is attached hereto as Exhibit F.

This understanding was manifested in a clear and detailed form when Laudes sought payment on its final invoice. On January 2, 2005, Mr. McLaren wrote to Laudes:

> The PCO contracts shop is very much part of the East Fallujah Camp Agreement (EFIC); one of our remaining responsibilities under our arrangement with our MOD contract brethren is [sic] ensure that your firm is paid timely and without delay by the MOD budget office after receiving your firm's final invoice. PCO initiated dialogue with Laudes on this very matter two weeks ago. The contentious nature of payment between Prime contractor and subcontractor, on a Military Base that is contractually administered by our PCO office, has now placed our office in [sic] slightly different role than was originally anticipated by the leadership of PCO and MOD; the inability of Laudes to definitize the remaining subcontractor invoice(s) on the Prime contract has now permitted the PCO contract shop to assume direct authority over the payment process concerning this contract.
>
> PCO will allow both parties involved, two (2) more days to settle the issues between your respective companies before PCO renders a final decision for both parties as to their final billing(s).
>
> ***In addition, PCO contracts will ensure fair payment of the monies owed once payment from MOD is seen as impending***. In the extreme that Laudes Corporation and AISG [subcontractor] cannot find a solution, PCO will provide the opportunity to have each contractor separately bill their PCO approved invoices to the MOD separately. ***Under this approach, PCO assumes direct authority over the process of payment and the responsibility of deficiencies, if any, concerning, concerning any lingering details of the ongoing EFIC operation.***
>
> Please do not make the mistake or be confused in anyway that PCO is anything other than deeply involved in the EFIC agreements, including all subcontractor complaints, constraints or complements of any kind. (emphases added).

(Attached hereto as Exhibit H.)

Despite the foregoing assurances, Mr. McLaren and PCO officials, were concurrently working to ensure Laudes was not paid. Though never disclosed to Laudes, the PCO believed

that Laudes should not be paid for its work due to alleged but never documented performance issues, so it took steps to ensure that the MOD would not pay Laudes, which is demonstrated by the email correspondence attached hereto as Exhibit J, and also was not disclosed to Laudes.

The PCO officials with whom Laudes dealt and who made the foregoing offers, undertakings and promises, including, without limitation, T.J. McClaren, Senior Contracts Administrator, PCO Contracts Activity, and LTC Hobson, PCO Contracts Activity, had authority to do so. Either an official's express actual authority, or implied actual authority, suffices to bind the US Government contractually. *H. Landau & Co. v. United States,* 886 F.2d 322, 324 (Fed. Cir. 1989).

The PCO Contracting Activity in Iraq was established expressly to "provide acquisition and project management support" to the US mission in Iraq, so the PCO officials with whom Laudes dealt clearly had actual express authority to bind the US Government in contract. In any event, implied authority can be derived from the Government's actions and intent. *Advanced Team Concepts, Inc.* v. *United States,* 68 Fed. Cl. 147, 1515 (2005). Where the power to contract is appropriate or essential to the performance of a Government's agent's duties, the agent has implied authority. *Brunner* v. *United States*, 709 Fed. Cl. 623 (2006). *See, e.g., Fed. Crop Ins. Corp.* v. *Merrill,* 332 US 380, 384 (1947) (finding implied authority when Government employee had authority to ensure that contractor acquired materials necessary to perform the contract and to draw checks on a Government account); *Advanced Team Concepts,* 68 Fed. Cl. At 150-51 (where scheduling work, hiring workers, and directing payment of invoices were central to officer's assigned tasks, officer had implied authority to bind the Government). In this case at hand, authority to bind the US Government contractually was an integral part of the

assigned duties of such PCO officials, and/or appropriate or essential to the performance of their duties.

Alternatively, LTC Hobson and other warranted PCO officials were aware or constructively aware of the pertinent statements, actions and assurances of the officers with whom Laudes dealt, and he demonstrably accepted their actions, and never ordered or directed such PCO officials to cease making such statements, actions, and directions. *Harbert/Lummus Agrifuels Prods.* v. *United States,* 142 F.3d 1429 (Fed. Cir. 1988) *cert. denied* 525 US 1177 (1999). Accordingly, the PCO Contracting Officer ratified the actions of his fellow PCO officials.

The facts and circumstances here also manifestly show mutuality of intent. The statements, actions and conduct of PCO officials before, during and immediately after performance, indicate that they shared Laudes belief and understanding that PCO had the authority to control all aspects of the Contract, and the obligation to ensure that Laudes was paid for its work.

To the extent that an official of the MOD purported to sign the contract on behalf of the IIG MOD, as "contracting officer," he did so at the direction and acting under the control of the PCO and/or MNF-I. Throughout Laudes' performance on the Contract, neither Dr. Cattan, nor any other IIG MOD officer or official, ever exercised any contract administration authority or directed Laudes' performance. The PCO exercised functions inherent to a principal authorized to bind the US Government, rather than an agent of IIG MOD in material respects, including, but not limited to: establishing the contract requirements and terms, making the source selection, directing engagement and arranging subcontractors, requiring work outside the SOW without formal modification to the contract, and making the decision to close out the contract, and the

decision not to pay Laudes. In e-mails to Laudes, PCO officials repeatedly referred to MNF-I, the PCO and the USG as the "Government" in the context of the Contract, thereby indicating that they believed that the US Government was the principal party to the Contract. *See* Exhibit F.

The services Laudes provided were for the direct use and/or benefit of the US Government. MFN-I and PCO officials established the Contract requirements, solicited bids, selected Laudes, and directed its performance, all to advance the military and political objectives of the US Government. These actions by MFN-I and PCO officials were an exercise of the US Government's authority over military and security operations in Iraq, specifically calculated to discharge the US Government's duties to provide for the organization, equipping and training of Iraqi security forces, as directed by the President in NSPD-36, and as reflected in the Allawi/Powell accords, which expressly reserved those functions to the US

Similarly but alternatively, the US Government exercised express contractual authority in dealings with Laudes in that it continued to occupy Iraq even after the so-called handover of sovereignty in June 2004, thus the US Government continued to act as an occupying power. As the de facto occupying power, under international law, treaties, and conventions, the US Government had the authority and obligation to provide for the security of the Iraqi people, and the right and obligation to use Iraqi and its own funds to pay for those functions. The military operations in Fallujah were an exercise of this authority and responsibility, and the PCO's dealings with Laudes in respect of the Contract were part of the US Government's exercise of such powers and responsibilities. For these reasons, privity of contract existed between the US Government and Laudes on the Contract, and Laudes is entitled to payment of the amounts due set forth herein from the US Government.

As a result of PCO's absolute control over all aspects of the Contract, the actual authority, express and/or implied, to bind the US Government of the PCO personnel with whom Laudes dealt, and the fact that the procurement at issue was for services which inured to the direct benefit of the US Government, the United States was the party with whom Laudes contracted. Accordingly, Laudes is entitled to, and hereby demands, payment of the $7,538,833.60 unpaid balance of the Contract price from the United States.

### B. *Equitable Adjustment of Contract Price to Reimburse Costs of Security Subcontractor*

As noted previously, as it began to perform the Contract, Laudes' workers and subcontractors were obstructed in their efforts by theft, violence and intimidation they experienced in and around the camp, from "friendly" Iraqi forces. Security issues in the camp included threats, intimidation, beatings and pistol-whippings of workers, and pilferage of fixtures and supplies by Iraqi security forces. At the times of the solicitation and award, no party foresaw that Laudes would need to deal with such threats to security in and around the camp. When it became clear that the situation required additional internal security, Laudes communicated concerns over the security situation to MNF-I and PCO officials, who expressly directed and authorized Laudes to hire a security team, and in fact, identified and recommended the contractor Laudes ultimately hired – EODT.

PCO personnel recognized and agreed with Laudes that hiring the EODT security team resulted in compensable costs for Laudes beyond the quoted contract. *See* Exhibit F. PCO personnel repeatedly stated orally that Laudes would be paid for hiring EODT and that there would be a written contract modification issued to memorialize the oral promises, and Laudes engaged and paid in full EODT in reliance on these promises. Despite these promises, PCO officials never followed up with a written modification. The PCO personnel who directed

Laudes to perform additional and changed work and to engage EODT had the authority to order such work and to bind the US Government to modifications of the contract and to pay for such work. Authority to bind the US Government contractually was an integral part of the assigned duties of such PCO personnel, and appropriate or essential to the performance of their duties. Alternatively, authorized PCO officials were aware of these actions, accepted them, and never disaffirmed or directed PCO personnel to cease making them. Where the government requests new work, not required by the contract, which increases the contractor's costs, the Government is liable for the contractor's increased costs in performing the increased work. *Bruce Construction Corp. v. United.*, 342 F.2d 516 (Ct. Cl. 1963).

Laudes' reliance on PCO officials' statements, actions, and promises that PCO would modify the Contract scope and price to reimburse Laudes for the costs of the EODT team was reasonable based on its past experience. In other contracts, the statements of work were orally revised numerous times but never finalized. In each instance in which the statements of work were revised to include additional or changed work, in some cases requiring Laudes to engage subcontractors, and Laudes was assured by PCO officials that additional funds would be made available to fairly compensate Laudes for the additional work, despite the absence of any executed modifications. Despite these assurances, Laudes' invoice item seeking reimbursement for the costs of the EODT team was never paid. Laudes paid the EODT invoice in full. Attached hereto as Exhibit I are copies of the EODT invoices and proofs of payment.

### C. *Breach of Contract: Failure to Reimburse Costs of Security Team PCO Directed Laudes to Hire*

Without regard to whether or not the US Government is liable for the balance due on the Contract or to adjust equitably and pay an increase of the Contract price to reimburse Laudes for

its additional costs in engaging a security team, the Government is liable for those costs because Laudes' engagement of EODT at PCO's direction stands on its own as an enforceable implied-in-fact contract for the procurement of services for the direct use and/or benefit of the United States. All the requisite elements are present: (1) both Laudes and PCO personnel intended and agreed that Laudes would engage EODT to meet security needs outside the scope of the Contract unanticipated at the time of Laudes' bid; (2) Laudes undertook the burden of paying for EODT's services and the US Government benefited directly from the services EODT provided, in that standing up the camp to support the retaking of Fallujah was a key political and military objective of US military forces and the MNF-I, thus constituting valid consideration; (3) the terms of EODT's engagement, including price and payment terms, were clear and unambiguous, and known and agreed to by PCO personnel before Laudes engaged EODT; (4) the PCO personnel who authorized and directed Laudes to engage EODT had the authority to order such work and to bind the US Government to reimburse Laudes' costs. Authority to bind the US Government contractually was an integral part of the assigned duties of such PCO personnel, and appropriate or essential to the performance of their duties. Alternatively, authorized PCO officials were aware of these actions, accepted them, and never disaffirmed or directed PCO personnel to cease making them. *See Anderson* v. *United States,* 344 F.3d 1343, 1353 (Fed. Cir. 2003) (setting forth elements of valid contract).

## IV. ***Requests for Relief***

**WHEREFORE,** Laudes Corporation requests the following relief:

Recovery of a sum certain in the amount of $11,516,829.30, which amount includes the following specific relief: (1) payment of the $7,538,833.60 balance of the original Contract

price; (2) equitable adjustment of the Contract price equal to the $3,506,167.20 costs, overhead and reasonable profit thereon, Laudes incurred in engaging and paying in full a security team at the direction of the PCO, which amounted to a change in the Contract scope of work; (3) payment of the $3,506,167.20 costs and reasonable profit thereon, of engaging the security team, which PCO officials authorized to bind the Government directed Laudes to hire with the mutual understanding and intent of the parties that Laudes would be compensated; (4) accrued interest on the foregoing sums as provided by the Prompt Payment Act in the amount of $471,828.50.

Laudes also invokes its rights for accrued post-claim submission interest as provided by the Contracts Disputes Act, in an amount to be established.

Laudes formally requests a final decision by the cognizant Contracting Officer on the claims presented herein.

**LAUDES CORPORATION**

By: Mark G. Jackson, WSBA #18325

GARVEY SCHUBERT BARER
1191 Second Avenue, Suite 1800
Seattle, Washington 98101
(206) 464-3939
(206) 464-0125 – fax

Counsel of Record for
LAUDES CORPORATION

**CERTIFICATION**

I hereby certify that this claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the contractor believes the Government is liable; and that I am duly authorized to certify the claim on behalf of the contractor.

SIGNED and DATED: this 29th day of ~~March, 2008,~~

{Print Name} LAWRENCE UNDERWOOD

{Title} PRESIDENT

LAUDES CORPORATION