# In the United States Court of Federal Claims

No. 08-121C

(Filed: March 16, 2009)

```
*******************************************  *
                                             *
                                             *
LAUDES CORPORATION,                          *    Contract with Iraqi Government;
                                             *    Promises by United States to
                    Plaintiff,               *    Facilitate Payment; Implied-In-
                                             *    Fact Contracts; Tucker Act
v.                                           *    Jurisdiction; Contract Disputes
                                             *    Act Not Applicable; Dismissal of
THE UNITED STATES,                           *    Counts Where No Privity Exists.
                                             *
                    Defendant.               *
                                             *
*******************************************  *
```

*Mark G. Jackson*, Ball Janik LLP, Seattle, Washington, for Plaintiff.

*J. Reid Prouty*, with whom were *Gregory G. Katsas*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Franklin E. White, Jr.*, Assistant Director, United States Department of Justice, Commercial Litigation Branch, Civil Division, Washington, D.C., for Defendant.

OPINION AND ORDER
ON DEFENDANT'S MOTION TO DISMISS

WHEELER, Judge.

Plaintiff Laudes Corporation ("Laudes") commenced this action on February 29, 2008 to recover contract payments due on a military base camp project it performed near Fallujah, Iraq in 2004. Laudes alleges that, at the urging of the United States, it entered into an express written contract with the Iraqi Government so that Iraqi Ministry of Defense funds could be used to pay for contract performance. When Laudes balked at this proposed arrangement, the United States Government allegedly promised to facilitate payment to Laudes if any problems with the Iraqi Government were encountered. Based upon the assurances of the United States, Laudes agreed to go forward with the work.

-1-

The contract called for Laudes to operate and maintain two base support camps in support of Iraqi Security Forces engaged in high priority military operations in and around Fallujah. The agreed contract price was $15,542,179.60, of which Laudes asserts it has only been paid $8,003,346. In addition, due to the hostile military environment in which the work was performed, Laudes retained a security subcontractor, EODT, to protect the work force. Laudes alleges that the United States recommended the use of this subcontractor and again promised that Laudes would be paid if any problems arose with the Iraqi Government. Laudes paid the subcontractor for its security services, but Laudes has not been reimbursed by the Iraqi Government or the United States for this work. Laudes' total claim is for $10,460,607.60, representing the unpaid balance of the contract price and the amount it paid to the security subcontractor.

The documents before the Court reflect that the Iraqi Ministry of Defense, Dr. Ziad Cattan, signed the Laudes contract, but that in all other respects the United States exercised complete control over the drafting, performance and administration of the contract. The United States appointed its own Contracting Officer, as well as a Contracting Officer's representative, and a State Department representative allegedly invoked an $8,000,000 cost ceiling on the work. The use of a contract with the Iraqi Government appears to have been motivated solely to assure that Iraqi funds would be used to pay for the project.

In a four-count amended complaint, Laudes claims that the United States is liable for: (a) breach of implied-in-fact contracts to facilitate and obtain payment from the Iraqi Government for Laudes' performance of the express contract, and for the cost of hiring the security contractor (Counts 1 and 4); and (b) breach of the underlying contract and recovery of the cost of the security contractor based on the United States Government's extensive involvement and control in the drafting, performance and administration of the contract (Counts 2 and 3).

Defendant has moved to dismiss the amended complaint, or in the alternative, for summary judgment, arguing that implied-in-fact contracts cannot exist where an express written contract is in place between the same parties covering the same subject matter. Defendant also asserts that Laudes failed to comply with the jurisdictional prerequisites of the Contract Disputes Act, 41 U.S.C. § 601 et seq. (2006) ("CDA"), requiring the contractor to submit a certified claim to the Contracting Officer before filing suit.

For the reasons explained below, the Court GRANTS Defendant's motion as to counts 2 and 3 of Plaintiff's amended complaint, but DENIES Defendant's motion as to counts 1 and 4. In brief summary, the implied-in-fact contracts alleged by Laudes do not involve the same parties or the same subject matter as the express written contract. The implied-in-fact contracts, if ultimately established, are between Laudes and the United States, whereas the

express written contract is between Laudes and the Iraqi Government.  The subject matter of the implied-in-fact contracts is a promise to facilitate payment, whereas the subject matter of the express written contract is to operate and maintain the base support camps.  The CDA is not applicable to the implied-in-fact contracts because they do not involve the procurement of property or services, or the construction, alteration, repair or maintenance of real property, or the disposal of real property.  41 U.S.C. § 602(a).  While Laudes will be required at trial to establish the existence of binding implied-in-fact contracts entered into by authorized representatives of the United States, the Court cannot say at this stage that no set of facts exists upon which Plaintiff would be able to recover.

Background

A.  <u>United States Contracting Activity in Iraq in Late 2004</u>

On May 11, 2004, President George W. Bush issued National Security Policy Directive 36 ("NSPD") setting forth a plan to transfer power in Iraq from the Coalition Provisional Authority ("CPA"), a United States entity, to the Iraqi Interim Government ("IIG").  (Am. Compl. ¶ 9, Oct. 8, 2008).  In order to implement NSPD 36, the United States Department of Defense created the Multinational Security Transition Command-Iraq ("MNSTC-I") under the direction of the Commander of Multinational Force-Iraq ("MNF-I"). Id. ¶ 10.  By separate letters to the United Nations Security Council ("Security Council") on June 5, 2004, United States Secretary of State Colin Powell and Iraqi Prime Minister Dr. Ayad Allawi determined that Iraqi security forces would continue to fall under the operational command of the MNF-I during military operations in order to achieve unity of the command.  Id. ¶¶ 11-12.  The MNF-I, under United States command and control, also agreed to undertake a broad range of tasks to contribute to the maintenance of security, ensure force protection, and train and equip Iraqi security forces.  Id. ¶ 12.  The Security Council approved Resolution 1546 on June 8, 2004 affirming the MNF-I's authority to take all necessary measures to contribute to the maintenance of security and stability in Iraq.  Id. ¶ 13.  On June 28, 2004, the United States dissolved the CPA and transferred much of its power to the IIG.  Id. ¶ 11.

In furtherance of the MNF-I's core mission, President Bush, through NSPD 36, established the Project and Contracting Office ("PCO"), a temporary organization within the United States Department of Defense to provide acquisition and project management support for activities in Iraq.  Id. ¶ 14.  Beginning in September 2004, the PCO, which became the Joint Contracting Command for Afghanistan and Iraq ("JCC") on December 4, 2005, served as the contracting authority for the MNF-I.   (Pl.'s Proposed Findings of Uncontroverted Facts 3-4 ¶ 1, Dec. 8, 2008).  The PCO was, and the JCC is, staffed by both military and civilian personnel from the United States.  Id. 4 ¶ 1.

B.  <u>The East Fallujah Iraqi Camp Contract</u>

In October 2004, the restive city of Fallujah had become a haven for terrorists staging attacks on MNF-I forces.  (Am. Compl. ¶ 16).  The United States military began the final preparations for "Operation Phantom Fury," an operation to extricate terrorists from Fallujah. <u>Id.</u> ¶ 17.  For political and operational reasons, the United States Government wanted Iraqi Security Forces ("ISF") to play a role in the battle to retake Fallujah.  (Pl.'s Proposed Findings 4 ¶ 2).  The ISF was to support the United States Marine Expeditionary Force in Operation Phantom Fury under the command of a Marine Corps general officer with the goal that the ISF would ultimately take over security of the city at the conclusion of the operation. <u>Id.</u>

1.  <u>Contract formation</u>

Lieutenant Colonel Mark Hobson from the PCO began working with Colonel David Saul, Chief of Strategic Plans for the MFN-I, to define specifications for the provision of accommodations, related infrastructure, and life support to be delivered to the ISF at a forward operating base near Fallujah.  <u>Id.</u> 4 ¶ 3.  Neither the IIG, the Iraqi Ministry of Defense ("Iraqi MOD"), nor the ISF participated in preparing these contract specifications. <u>Id.</u>  On October 19, 2004, Colonels Hobson and Saul agreed on a Statement of Work ("SOW") for a contract that eventually became known as the East Fallujah Iraqi Camp ("EFIC").  <u>Id.</u> 5 ¶ 4.  In a series of emails between them on that day, Colonel Hobson described the EFIC effort as "our number one priority."  <u>Id.</u> 5 ¶ 5.  He went on to discuss funding for the project, informing Colonel Saul that the growing scope of the EFIC requirement and anticipated costs would likely exceed $5 million, a threshold that "allows me to execute without advertising the requirement beyond getting three quotes."  <u>Id.</u>  Colonel Hobson also informed Colonel Saul that he "need[ed] to get a solid requirement from you on what you [sic] basic need is going to be and funding," to which Colonel Saul replied: "I was under the impression that we budgeted the Iraqi $10m for a [brigade] (5000) over three months.  I am not expecting anything like that duration or cost here."  <u>Id.</u>  Colonel Hobson sent a follow-up email to Colonel Saul later that day asking: "any idea when we will have funding?  We can begin some preliminary heads up with the contractors until funding is obtained."  <u>Id.</u>  Colonel Saul responded that Patrick Marr, a United States Department of State official, had "the money trail sorted out."  <u>Id.</u> 5-6 ¶ 5.  Colonel Hobson replied and copied Patrick Marr on the email, stating: "I will get with Mr. Marr to iron out the funding so we can officially get this on the street.  I assume Mr. Marr will be able to provide me the locations when I see him on the funding."  <u>Id.</u> 6 ¶ 5.  Other United States Government officials were copied on these emails, but Iraqi officials were not.  <u>Id.</u>

At 7:35 AM Baghdad time on October 20, 2004, Mr. T.J. McLaren, Senior Contracts Administrator for the PCO, sent an email to Laudes requesting the company to submit a Rough Order of Magnitude ("ROM"), or proposal, meeting the requirements of the SOW by 12:00 PM that day. Id. 6 ¶¶ 6-7. Mr. McLaren sent the email with the knowledge, and under the direction and control, of Colonel Hobson. Id. 6 ¶ 6. He did not indicate that the contract would be for the IIG. (Am. Compl. ¶ 26). At 11:05 AM on October 20, 2004, Mr. McLaren emailed to Laudes a copy of the SOW. (Pl.'s Proposed Findings 6 ¶ 8). Mr. McLaren emphasized in capital letters that: "IT SHOULD BE UNDERSTOOD THAT THERE IS NO GREATER IMPORTANCE TODAY IN ANYONES [sic] WORK WORLD THAT IS MORE IMPORTANT THAN THIS REQUIREMENT. PLEASE PRICE AND PLAN ACCORDINGLY." Id. 6-7 ¶ 8. The contract terms indicated that the contract would be paid with Iraqi funds, but nothing suggested that the contract would be with the IIG. (Am. Compl. ¶ 27).

In light of its work on other projects in Iraq, Laudes initially did not wish to make an offer on the EFIC contract. (Pl.'s Proposed Findings 7 ¶ 9). However, Mr. McLaren and Colonel Hobson pressed Laudes to submit an offer and undertake the work, and, accordingly, Laudes provided a quote to the PCO on October 21, 2004 for $15,542,179.60. Id. The PCO accepted the offer within hours of its receipt. Id. However, Laudes had concerns about receiving payment from the Iraqi MOD in light of the limited functionality of the IIG. Id. 10 ¶ 17. As an inducement to sign the contract, PCO officials, including Mr. McLaren and Colonel Hobson, repeatedly gave oral assurances to Laudes that it would receive payment for its work because the PCO would facilitate and obtain payment from the Iraqi MOD. Id. Later that day, Ms. Sandra Ellis, comptroller for Laudes, signed the contract along with Dr. Ziad Cattan, who purported to sign the contract on behalf of the Iraqi MOD as the contracting officer. (Am. Compl. ¶ 29). Signing the contract was the extent of Dr. Cattan's involvement with the contract formation and administration. Id. ¶ 30. Laudes alleges that Dr. Cattan later fled Iraq and is accused of misappropriating $800 million in Iraqi MOD funds. Id. Laudes states that he now resides in Poland and was convicted in absentia by an Iraqi court and sentenced to 60 years in prison for misuse of public funds. Id.

The EFIC contract was printed on a General Services Administration Standard Form 1449, the form used by United States Government agencies for commercial items contract actions, and given the MNF-I contract number USMI-04-CONTIG-FOB-01. Id. ¶ 29. The contract listed Mr. McLaren as the contract administrator, and it stated that the contract was issued by the "PCO CONTRACTING ACTIVITY." Id. The contract also provided in Block 18a that payment would be made by the Iraqi MOD. (Def.'s Proposed Findings of Uncontroverted Facts ¶ 2, Nov. 7, 2008). Block 26 of the contract, entitled "Accounting and Appropriation Data," contained the words "IRAQI MINISTRY OF DEFENSE AUTHORIZED FUNDING." Id. The contract also stipulated that Laudes could assign its

right to payment under the contract in ways "similar to the United States Law(s)." Id. ¶ 4. The contract's dispute clause stated that the "contract is subject similar to the United States Law(s) with the Contract Disputes Act of 1978." Id. It provided further that "[i]nvoices will be handled similar to the United States Laws with the Prompt Payment Act . . . ." Id. Elsewhere, under the heading "Prompt Payment," the contract included language that "[t]he Iraqi Government will make payment similar to the United States Laws with the Prompt Payment Act (31 U.S.C. 2903) and prompt payment regulations at 5 CFR part 1315." Id.

### 2. Contract performance

Laudes immediately began performance on the EFIC contract. (Pl.'s Proposed Findings 7 ¶ 9). By memorandum dated November 1, 2004, United States Air Force Major Kenneth R. Caryer, acting as Contracting Officer for the contract and exercising authority under Defense Federal Acquisition Regulation ("DFARS") 201.601, appointed United States Marine Major Mark Conway as the Contracting Officer's Representative ("COR") for the contract. Id. 7 ¶ 10. No Iraqi official signed the appointment. Id. PCO officials, including Colonel Hobson, Mr. McLaren and Major Conway, exercised complete control over contract terms and requirements, source selection, administration, changes, contractor performance, and contract close-out with no involvement of Iraqi officials. Id. 7 ¶ 11. These United States officials orally directed Laudes to undertake many tasks not set forth in the SOW, without any notification to or input from the Iraqi MOD. Id. 8 ¶ 11.

Shortly after agreeing to the EFIC contract, a Laudes subcontractor declined to provide services because of concerns about the publicity and security surrounding the Fallujah project. Id. 8 ¶ 12. A replacement subcontractor began working for Laudes, but that company ceased performing and terminated the contract when the owner's son was kidnapped. Id. Laudes hired a third subcontractor but terminated the company because of substandard performance. Id. At the direction of Mr. McLaren, Laudes then hired a fourth subcontractor, which performed satisfactorily under the intense guidance and direction of Laudes' personnel. Id.

Operations surrounding the EFIC contract were difficult, costly, and time-consuming due to the precarious security situation. Id. 8 ¶ 13. Laudes' personnel spent nearly half of every day maneuvering through checkpoints between Baghdad and Fallujah. Id. All vehicles entering or departing EFIC required convoy protection, which had to coordinate with United States military personnel. Id. In addition, Iraqi insurgents repeatedly attacked the camp site, and the ISF routinely destroyed, pilfered, and stripped equipment that Laudes had installed at the site. Id. Once the ISF began to occupy EFIC, Iraqi forces inflicted violence and intimidation on Laudes employees. Id. In one instance, Iraqi forces broke a Laudes

employee's arm and in another, forced an employee to the ground by putting a weapon to his head.  Id. 8-9 ¶ 13.

Laudes communicated its safety concerns to MNF and PCO officials, who expressly authorized and directed Laudes to hire a security subcontractor.  Id. 9 ¶ 13.  Mr. McLaren sent Mr. Larry Underwood, a Laudes official, an email regarding the security situation that led to the hiring of a security subcontractor.  The email stated:

> The Government must be assured of the success of its funded projects; as the contracts administrator on this effort, and appointed representative to your company and the MNFI, I need to be informed of all decisions that may or may not affect the success of this [Forward Operating Base] mission.  Information learned will be immediately passed up to the Government leadership chain of command, both in PCO and MNFI.  Please make sure I am in your meeting.  TJ.

Id. 9 ¶ 14.  PCO officials recognized that hiring a security subcontractor resulted in compensable costs for Laudes that would increase the overall price of the contract.  Id. 10 ¶ 15.  To that end, they repeatedly stated orally that Laudes would receive payment for hiring the security subcontractor and that they would make a written contract modification to memorialize the promises.  Id.  Based on these assurances and the direction of Mr. McLaren, Laudes hired EODT as its security subcontractor and paid the company in full before seeking payment on the contract.  (Am. Compl. ¶ 34).  However, PCO officials never followed through with their promises to modify the contract, and the Iraqi MOD's failure to pay Laudes caused the company significant financial hardship.  (Pl.'s Proposed Findings 10 ¶ 15).

3.  Contract payment

Laudes performed work on the EFIC contract from approximately October 21, 2004 through December 23, 2004.  Id. 10 ¶ 16.  The company submitted its final invoice to the PCO for $18,463,953.60 on December 23, 2004, an amount $2,921,744 more than its original price.  Laudes incurred this additional amount to hire the security subcontractor.  Id.  During performance of the contract, PCO officials made repeated oral promises to facilitate and obtain payment from the Iraqi MOD for the cost of hiring the security subcontractor.  Id. 10 ¶ 17.  Upon receipt of this invoice, Mr. McLaren sent the following email to Laudes:

> The PCO contracts shop is very much part of the East Fallujah Camp Agreement (EFIC); one of our remaining responsibilities

under our arrangement with our MOD contract brethren is [sic] ensure that your firm is paid timely and without delay by the MOD budget office after receiving your firm's final invoice.   PCO initiated dialogue with Laudes on this very matter two weeks ago. The contentious nature of payment between Prime contractor and subcontractor, on a Military Base that is contractually administered by our PCO office, has now placed our office in [sic] slightly different role than was originally anticipated by the leadership of PCO and MOD; the inability of Laudes to definitize the remaining subcontractor invoice(s) on the Prime contract has now permitted the PCO contract shop to assume direct authority over the payment concerning this contract.

PCO will allow both parties involved, two (2) more days to settle the issues between your respective companies before PCO renders a final decision for both parties as to their final  billing(s).

In addition, PCO contracts will ensure fair payment of the monies owed once payment from MOD is seen as impending.   In the extreme that Laudes Corporation and AISG [subcontractor] cannot find a solution, PCO will provide the opportunity to have each contractor separately bill their PCO approved invoices to the MOD separately.  Under this approach, PCO assumes direct authority over the process of payment and the responsibility of deficiencies, if any, concerning . . . any lingering details of the ongoing EFIC operation.

Please do not make the mistake or be confused in anyway that PCO is anything other than deeply involved in the EFIC agreements, including all subcontractor complaints, constraints or complements of any kind.

Id. 11-12 ¶ 19.   Despite these assurances by the PCO, the Iraqi MOD did not pay Laudes within 30 days of receiving the final invoice, as required under the contract.  (Am. Compl. ¶ 45).  As a result, Laudes' Comptroller Sandra Ellis traveled to the MOD herself to demand payment from the IIG.  (Pl.'s Proposed Findings 12 ¶ 20).  Dr. Cattan, on behalf of the MOD, eventually made a partial payment of $8,003,346 to Laudes based on the invoices Laudes had received from its subcontractors at that time and at the direction of the PCO and State Department official Patrick Marr.  (Am. Compl. ¶ 46).  Laudes' invoice to the Iraqi MOD made clear that a balance would remain on the contract after payment of the $8,003,346. (Pl.'s Proposed Findings 12 ¶ 20).  Laudes later submitted additional invoices to the MOD

through Dr. Cattan, but Mr. Marr informed Dr. Cattan that he would not authorize payment because no more Iraqi funds existed for the Fallujah project. (Am. Compl. ¶ 46). An internal email from Mr. McLaren to another PCO official described Ms. Ellis's actions as an "end run" around the PCO. (Pl.'s Proposed Findings ¶ 20). This email stated:

> EFIC [FUNDING] HAS ALREADY BEEN CAPPED BY STATE DEPARTMENT, CURTISY [sic] OF MR. PATRICK MARR . . . . LT. COL. HOBSON INITIALLY GAVE THEM [Laudes] THE BOOT, THEN EXPLAINED TO THEM WHY HE WASN'T GOING TO PAY THEM THE REMAINING $8 MILLION. SANDY [ELLIS] TRIED TO PULL AN END AROUND AND TOOK THE INVOICE DIRECTLY TO THE MOD INSTEAD. DR ZAIAD [sic] AND SECRETARY GENERAL BRUSKA HAND WALKED THE LAUDES INVOICE DOWN TO BRITISH/COALITION MOD REPRESENTATIVE AND HE THEN GAVE IT TO MR. MARR . . . .

Id. 12 ¶ 21. PCO officials failed to inform Laudes that the United States State Department had capped funding for the EFIC contract at an amount below the face value of the contract or that the United States Government, not the Iraqi MOD, exercised authority over funding for the project. Id. 12-13 ¶ 22. To this date, Laudes has not received payment for the remaining services performed under the EFIC contract.

C. The Present Litigation

On February 29, 2008, Plaintiff filed its original complaint in the Court of Federal Claims under the Tucker Act, 28 U.S.C. § 1491 (2006), alleging that the United States breached an implied-in-fact contract to facilitate and obtain payment from the Iraqi MOD for Laudes' services under the EFIC contract. On April 12, 2008, Plaintiff submitted a "Certified Claim for Breach Of Contract and Equitable Adjustment" to the Joint Contracting Command, seeking relief under the Contract Disputes Act ("CDA") for breach of the underlying EFIC contract, an equitable adjustment to the contract price to reimburse Laudes for the cost of hiring the security subcontractor, and breach of contract in failing to reimburse Laudes for hiring the security subcontractor. The JCC denied the CDA claims on August 18, 2006, and Laudes filed an amended complaint in this Court on October 8, 2008 to incorporate the denied claims into its original complaint. Count 1 of the amended complaint alleges that Defendant, by and through PCO officials in Iraq, breached an implied-in-fact contract to facilitate and obtain payment from the Iraqi Government for the work Plaintiff performed on the EFIC contract. (Am. Compl. ¶ 61). Count 2 alleges that the PCO's actions in signing and administering the underlying EFIC contract bound the United States as a party, and

therefore, Defendant breached the contract in failing to pay Plaintiff.  Id. ¶ 78.  Count 3 alleges that Plaintiff is entitled to an equitable adjustment of the underlying contract price to cover the cost incurred in hiring a security subcontractor based on the promises PCO officials made to modify the contract.  Id. ¶¶ 82-84.  Finally, count 4 alleges that Defendant breached an implied-in-fact contract to reimburse Plaintiff for the cost of hiring a security subcontractor.  Id. ¶ 86.

On June 16, 2008, Defendant filed a motion to dismiss, or, in the alternative, for summary judgment.  Plaintiff filed its response on July 17, 2008, and Defendant filed its reply on August 1, 2008.  Following the October 8, 2008 amendment of Plaintiff's complaint, this Court granted Defendant's motion to revise its motion to dismiss.  On November 7, 2008, Defendant submitted its revised motion for dismissal, or, in the alternative, for summary judgment, to which Plaintiff responded on December 8, 2008.  Defendant filed its reply on January 9, 2009, and the Court heard oral argument on the motion on February 6, 2009.

## Discussion

### A.  Standards of Review

Defendant has filed a "motion for dismissal, or, in the alternative, for summary judgment," citing Rules 12(b)(1), 12(b)(6), and 56 of the Rules of the Court of Federal Claims ("RCFC").  When considering a motion to dismiss for lack of subject matter jurisdiction under RCFC 12(b)(1), the Court accepts as true the undisputed allegations in the complaint and draws all reasonable inferences in favor of the plaintiff.  Hamlet v. United States, 873 F.2d 1414, 1416 (Fed. Cir. 1989) (citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), abrogated on other grounds by, Harlow v. Fitzgerald, 457 U.S. 800 (1982)).  Plaintiff bears the burden of establishing by a preponderance of the evidence the facts sufficient to invoke the Court's jurisdiction.  See Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988) (citation omitted).  In determining whether Plaintiff has met this burden, the Court may look "beyond the pleadings and 'inquire into jurisdictional facts' in order to determine whether jurisdiction exists."  Lechliter v. United States, 70 Fed. Cl. 536, 543 (2006) (quoting Rocovich v. United States, 933 F.2d 991, 993 (Fed. Cir. 1991)).  This Court will dismiss for lack of subject matter jurisdiction only where it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief.  See Frymire v. United States, 51 Fed. Cl. 450, 454 (2002) (quotations omitted).  In the present case, both Plaintiff and Defendant have submitted evidentiary documents in support of their pleadings.  The Court refers to these materials "to the extent that they allow the court to determine whether it has jurisdiction over this case."  Lechliter, 70 Fed. Cl. at 543.

It is well-settled that a complaint should be dismissed under RCFC 12(b)(6) "when the facts asserted by the claimant do not entitle him to a legal remedy." Lindsay v. United States, 295 F.3d 1252, 1257 (Fed. Cir. 2002). When considering a motion to dismiss for failure to state a claim upon which relief may be granted, the Court "must accept as true all the factual allegations in the complaint, . . . and [the Court] must indulge all reasonable inferences in favor of the non-movant . . . ." Sommers Oil Co. v. United States, 241 F.3d 1375, 1378 (Fed. Cir. 2001) (citations omitted); see also Huntleigh USA Corp. v. United States, 63 Fed. Cl. 440, 443 (2005) (denying the defendant's motion to dismiss) (citation omitted). While detailed factual allegations in the complaint are not necessary, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . ." Bell Atl. Corp. v. Twombly, 127 S.Ct. 1955, 1964-65 (2007) (citations omitted).

Finally, summary judgment is appropriate under RCFC 56 when there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. See RCFC 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Telemac Cellular Corp. v. Topp Telecom, Inc., 247 F.3d 1316, 1323 (Fed. Cir. 2001), rehearing en banc denied, (2001) (citation omitted). Summary judgment will not be granted if "the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." Liberty Lobby, 477 U.S. at 248; see also Eli Lilly and Co. v. Barr Labs., Inc., 251 F.3d 955, 971 (Fed. Cir. 2001), rehearing en banc denied, (2001) (citation omitted). In reviewing a motion for summary judgment, the benefit of all presumptions and factual inferences runs in favor of the non-moving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986) (quotation omitted); Lathan Co., Inc. v. United States, 20 Cl. Ct. 122, 125 (1990) (citation omitted). The moving party bears the initial burden of showing an absence of evidence to support the opposing party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The non-movant must come forward with specific facts that give rise to genuine issues of material facts. RCFC 56(e); Matsushita, 475 U.S. at 587 (quotation omitted). Disputes over facts that might affect the outcome of the case are considered "material." See Liberty Lobby, 477 U.S. at 247-48. If the non-moving party produces sufficient evidence to raise a genuine issue of fact material to the outcome of the case, the motion for summary judgment should be denied. See id. at 248. Plaintiff asks the Court to defer ruling on Defendant's RCFC 56 motion for summary judgment until Plaintiff has had opportunity for discovery on the issue of whether PCO officials had the authority to bind the United States in an implied-in-fact contract with Plaintiff. However, the Court's denial of Defendant's RCFC 56 motion as to counts 1 and 4 of the Complaint, which raise the alleged implied-in-fact contract, renders Plaintiff's request moot.

B.  Plaintiff's Implied-In-Fact Contract Claims

Counts 1 and 4 of Plaintiff's amended complaint allege implied-in-fact contracts in which Defendant agreed to facilitate and obtain payment for the underlying EFIC contract and to reimburse Plaintiff for the cost of hiring a security subcontractor.  Defendant requests that the Court dismiss these counts on the grounds that: (1) count 1 does not comply with the jurisdictional prerequisites of the Contract Disputes Act; (2) counts 1 and 4 are impermissible implied-in-fact contracts because they involve the same subject matter as an express written contract between the same parties; and (3) PCO officials did not have the authority necessary to bind the United States in the alleged implied-in-fact contracts.  Drawing all reasonable inferences in favor of Plaintiff, the Court denies Defendant's motion to dismiss as to counts 1 and 4.

1.  The Court has jurisdiction under the Tucker Act.

Defendant argues that the Court must dismiss Count 1 of Plaintiff's complaint for lack of subject matter jurisdiction because a plaintiff may not file suit in the Court of Federal Claims under the Contract Disputes Act ("CDA") unless it has first obtained a final decision from a contracting officer.  The CDA mandates that "[a]ll claims by a contractor against the government relating to a contract shall be in writing and shall be submitted to the contracting officer for a decision." 41 U.S.C. § 605(a) (2006).  Furthermore, a plaintiff may not advance a CDA claim in this Court until a contracting officer has reached a final decision.  Bath Iron Works, Corp. v. United States, 20 F.3d 1567, 1578 (Fed. Cir. 1994), rehearing en banc denied, (2001) (citing Milmark Servs., Inc. v. United States, 231 Ct. Cl. 954, 1982 WL 25817, *2 (Sept. 3, 1982)).  Plaintiff admits that it filed its original complaint in this Court on February 29, 2008 and did not submit a claim to a contracting officer until March 29, 2008.  However, Plaintiff argues that Count 1, which made up the entirety of Plaintiff's original complaint, falls under the Tucker Act and not the CDA.

The Court agrees with Plaintiff that count 1 falls under the jurisdiction of the Tucker Act and not the CDA.  The Tucker Act grants the Court of Federal Claims broad jurisdiction over "express or implied contract(s) with the United States." 28 U.S.C. § 1491(a)(1).  By contrast, the CDA only applies to express or implied contracts entered into by the United States for: (1) the procurement of property, other than real property in being; (2) the procurement of services; (3) the procurement of construction, alteration, repair or maintenance of real property; or (4) the disposal of personal property.  41 U.S.C. § 602(a)(1)-(4) (2006).  Furthermore, the Court's CDA jurisdiction over services extends only to the *procurement* of services by the Government and not the *provision* of such services.  Fl. Power & Light Co. v. United States, 307 F.3d 1364, 1371 (Fed. Cir. 2002) (emphasis added).  The meaning of "procurement" under  the CDA is "the acquisition by purchase,

lease or barter, of property or services for the *direct benefit or use of the Federal Government
. . . .*" New Era Constr. Co. v. United States, 890 F.2d 1152, 1157 (Fed. Cir. 1989), rehearing
denied, (1990) (citation omitted) (emphasis in original). Intangible forms of consideration,
such as bailment contracts, contracts for uranium enrichment services, and guarantees of
government money orders, do not qualify as "procurements" under the CDA. See Telenor
Satellite Servs., Inc. v. United States, 71 Fed. Cl. 114, 119 (2006) (ruling that an alleged
bailment contract for the possession of electronic transmission equipment did not involve a
contract for the procurement of goods or services); Fl. Power & Light Co., 307 F.3d at 1373-
74 (holding that the Court of Federal Claims did not have CDA jurisdiction over a contract
in which utility companies delivered unenriched uranium to the Government, the
Government enriched the material, and the Government delivered the enriched uranium to
another utility); Arbitraje Casa de Cambio, S.A. De CV., v. United States, 79 Fed. Cl. 235,
240 (2007) (concluding that a contract in which the plaintiff cashed government money
orders from payees in exchange for the Government's promise to repay the money was not
for the "direct benefit or use" of the Government and therefore did not fall under the CDA).

Defendant has accurately stated the black letter law regarding the CDA but has
mischaracterized the nature of Plaintiff's claim.  Count 1 seeks relief from Defendant based
on an implied-in-fact contract theory that the PCO agreed to facilitate and obtain payment
from the Iraqi Government in exchange for Plaintiff's performance of its obligations under
the EFIC contract.  The Court has Tucker Act jurisdiction over the claim because it alleges
an implied-in-fact contract with the United States.  See 28 U.S.C. § 1491(a)(1).  However,
the CDA does not apply because Count 1 alleges a contract for a service provided by the
Government but from which the Government did not directly benefit.  Plaintiff asserts that
the PCO induced Laudes to enter into the underlying EFIC contract with the Iraqi
Government based on this promise to guarantee payment, not that Defendant was a party to
the underlying EFIC contract. The facts resemble those in Arbitraje in which the plaintiffs,
Mexican exchange houses, argued that they only consented to accept money orders from
payees after the United States Postal Service ("USPS") agreed to refund fraudulent money
orders.  79 Fed. Cl. at 238.  The exchange houses sued the United States for breach of
contract when the USPS failed to refund fraudulent money orders, but the United States
moved to dismiss the case on the grounds that the plaintiffs failed to obtain a contracting
officer's final decision as required by the CDA.  Id. at 239.  The Court, however, held that
the USPS's agreement to repay the reclaimed money did not directly benefit the United States
and therefore did not fall within the CDA's jurisdiction.  Id. at 240.  Here, as in Arbitraje,
Defendant did not stand to benefit directly from the alleged contract merely by agreeing to
obtain and facilitate payment from the Iraqi Government.

The CDA also does not apply because the facts in count 1 involve Defendant's alleged
breach of an agreement to facilitate and obtain payment from a third party rather than to

make payment itself. The CDA grants jurisdiction over contracts for the procurement of services and not the provision of services. Fl. Power & Light Co., 307 F.3d at 1371. Furthermore, intangible forms of consideration, such as a guarantee of payment, do not constitute procurements of services under the CDA. See Arbitraje, 79 Fed. Cl. at 240. The Court therefore concludes that the CDA does not apply to Count 1, and Plaintiff was not required to obtain a contracting officer's final decision prior to seeking redress in this Court. Accordingly, the Court denies Defendant's motion to dismiss count 1 for lack of subject matter jurisdiction.

### 2. Plaintiff has pled valid implied-in-fact contracts.

In the alternative, Defendant urges the Court to dismiss counts 1 and 4 on the grounds that they allege implied-in-fact contracts involving the same subject matter as an express contract between the same parties. There is no question that the existence of an express contract precludes an implied-in-fact contract between the parties on the same subject matter. Schism v. United States, 316 F.3d 1259, 1278 (Fed. Cir. 2002) (citing Atlas Corp. v. United States, 895 F.2d 745, 754-55 (Fed. Cir. 1990)); Trauma Serv. Group v. United States, 104 F.3d 1321, 1326 (Fed. Cir. 1997) (citations omitted); ITT Fed. Support Servs., Inc. v. United States, 531 F.3d 522, 528 n.12 (Ct. Cl. 1976) (citations omitted). Plaintiff does not dispute this statement of the law but argues instead that the alleged implied-in-fact contracts do not involve either the same parties or the same subject matter as the underlying express contract.

Plaintiff has met its burden of asserting facts that the two alleged implied-in-fact contracts do not involve the same subject matter or parties as the underlying EFIC contract. For the purposes of this portion of Defendant's motion to dismiss, Plaintiff does not dispute that it entered into the EFIC contract with the Iraqi Government for the provision of accommodations, related infrastructure, and life support to be delivered to Iraqi forces near Fallujah. Count 1 of the amended complaint alleges an implied-in-fact contract between Plaintiff and the United States – not the Iraqi Government – to facilitate and obtain payment by the Iraqi Government. Defendant, citing Schism, argues that facilitating and obtaining payment relates to the same subject matter as making payment. Schism held that "the existence of an express contract precludes the existence of an implied-in-fact contract dealing with the same subject matter, unless the implied contract is entirely unrelated to the express contract." 316 F.3d at 1278 (citation omitted). The Court in Schism found that an alleged promise by military recruiters to provide free lifetime medical care to military retirees in exchange for twenty years of service did not create an implied-in-fact contract because the retirees previously had signed a written contract with the recruiters agreeing to be bound by military regulations and statutes that expressly prohibited retirees from receiving free lifetime medical care. Id. Here, the alleged implied-in-fact contract does not involve the same subject matter or parties as in Schism. Agreeing to *facilitate or obtain* payment is not the

same as agreeing to *make* payment from one's own coffers.  Therefore, Defendant's reliance on the case is unfounded.

Count 4 of the amended complaint alleges an implied-in-fact contract between Plaintiff and Defendant to reimburse Plaintiff for hiring a security subcontractor, a cost not included in the underlying EFIC contract.  Defendant argues that "[i]t is of no moment . . . that the express contract here was with the Government of Iraq and not with the PCO . . . . [I]f the existence of an express contract addresses the intent of the parties to an alleged implied-in-fact contract, the technical identity of the parties need be of no consequence." (Def.'s Brief at 8-9).  In support of this proposition, Defendant cites Swanson v. Levy, 509 F.2d 859 (9th Cir. 1975).

The Court finds that Defendant has stretched the meaning of Swanson.  That case involved an employer who hired an employee to establish a chain of restaurants and guaranteed the employee a personal loan, which the employee would repay through payroll deductions from his salary. 509 F.2d at 860.  The employer later notified the employee by letter that his salary would be furloughed but requested that the employee continue to seek corporate financing for the restaurants, to which the employee agreed.  Id.  The employee then defaulted on the loan, and the employer brought suit seeking reimbursement.  Id.  The employee counterclaimed for breach of his employment contract, and the district court rendered an oral decision denying both the claim and counterclaim.  Id.  On appeal, the Ninth Circuit found substantial evidence from which the district court could have concluded that an express employment contract existed between the employer and employee and that the employee's efforts to seek financing for the restaurant during the course of employment benefitted not only the employer's company but the employer as an individual as well.  Id. at 861-62.  As a result, the court would not disturb the lower court's holding that the express employment contract obviated the implied-in-fact contract on the same subject matter because the individual employer and the corporation were one and the same.  Id. at 862.

Nothing in Swanson suggests that the technical identity of the parties to the contract does not matter if an intent to contract exists.  The Ninth Circuit merely found that substantial evidence existed upon which the lower court could find that the individual employer and the corporate entity were the same parties based on a theory of piercing the corporate veil.  See id.  Here, Plaintiff alleges that it entered into an express contract with the Iraqi Government for the underlying EFIC contract and an implied-in-fact contract with the United States to pay for the cost of hiring a security subcontractor.  At trial, Plaintiff will have the opportunity to show whether the evidence supports its claim.  Many fact issues may bear upon that claim. For the purposes of this motion, the Court must accept as true the factual allegations that PCO personnel acted on behalf of the United States and not the Iraqi Government, and accordingly, the Court must deny Defendant's motion to dismiss as to counts 1 and 4.

### 3.  A genuine issue of material fact exists on whether PCO officials had the authority to enter into implied-in-fact contracts under counts 1 and 4.

Defendant next asks the Court to dismiss counts 1 and 4 of Plaintiff's amended complaint for lack of subject matter jurisdiction because PCO officials, as agents of the United States, did not have authority to bind the Iraqi Government in implied-in-fact contracts with Plaintiff.  Defendant argues that the alleged promises by PCO officials could only have been made by them in their capacities as *agents of the Iraqi Government* in their role as contract administrators because "Government officials may not be held liable, via implied-in-fact contract, for promising what another country would do . . . ." (Def.'s Brief at 10).  Accordingly, Defendant points to <u>Somali Development Bank v. United States</u>, where the Court stated: "[i]t is well settled that such a warranty as plaintiffs claim will not be implied on the part of the United States where the warranty is not expressly provided for in a statute or contract."  508 F.2d 817, 822 (Ct. Cl. 1974) (citations omitted).

Defendant has confused counts 1 and 4 with the underlying express contract entered into by PCO officials acting as contract administrators on behalf of the Iraqi Government.  Count 1 alleges that PCO officials, acting on the United States' behalf, breached an implied-in-fact contract to facilitate and obtain payment from Iraq.  It does not seek to hold the United States accountable for the Iraqi Government's failure to pay on the underlying contract.  Count 4 alleges that the United States breached a separate, implied-in-fact contract with Plaintiff to pay for security services not provided for in the underlying express contract.  As claims against the United States based on implied-in-fact contracts, they fit squarely within the Tucker Act's jurisdiction.  <u>See</u> 28 U.S.C. § 1491(a)(1).

Whether PCO officials had actual authority to bind the United States in an implied-in-fact contract is a genuine issue of material fact which precludes dismissal of counts 1 and 4 at this time.  It is well-settled that a government official who allegedly binds the Government to a contract implied-in-fact must have had the actual authority to do so.  <u>Goolsby v. United States</u>, 21 Cl. Ct. 629, 631 (1990) (citation omitted).  The Government will not be bound by the unauthorized acts of its agents.  <u>Id.</u>  (citation omitted).  Implied actual authority, like express actual authority, will suffice to bind the Government, but apparent authority will not.  <u>Cal. Sand and Gravel, Inc. v. United States</u>, 22 Cl. Ct. 19, 26-27 (1990) (citing <u>H. Landau & Co. v. United States</u>, 886 F. 2d 322, 324 (Fed. Cir. 1989)).  However, "a general allegation of authorization, liberally construed from the facts alleged in a complaint, is sufficient to withstand a motion to dismiss." <u>Arbitraje</u>, 79 Fed. Cl. at 241 (citing <u>Sommers Oil Co.</u>, 241 F.3d at 1380).  Plaintiff has alleged facts sufficient to establish that PCO officials, through their actions as contracting agents for the United States, had the authority to bind the United States in implied-in-fact contracts to facilitate and obtain payment from the Iraqi Government for the EFIC contract and for the cost of hiring a security subcontractor.  For example,

Plaintiff alleges that the State Department capped Iraqi funds available to pay for the EFIC contract. If true, this fact suggests that the United States did have authority over funds available for the EFIC contract. Accepting these allegations as true and drawing all reasonable inferences in favor of Plaintiff, the Court denies Defendant's motion to dismiss counts 1 and 4 based on Defendant's assertion that PCO officials lacked the authority to enter into the implied-in-fact contracts at issue.

C. Defendant's Motion is Granted as to Counts 2 and 3 Because Plaintiff Entered into an Express Contract with Iraq and Not the United States.

Defendant asks the Court to dismiss counts 2 and 3 of the amended complaint on the grounds that the United States was not a party to the express contract in question. Counts 2 and 3 seek to hold Defendant accountable for payments on the underlying EFIC contract and for the cost of hiring the security subcontractor based on the PCO's extensive involvement in signing, administering, and allegedly promising to modify the EFIC contract. Unlike counts 1 and 4, these counts assert that the United States is liable for breach of the express contract between Plaintiff and the Iraqi Government and not the implied-in-fact contracts between Plaintiff and Defendant.

The Court grants Defendant's motion to dismiss counts 2 and 3 because even extensive involvement by the United States in administering the EFIC contract cannot overcome the lack of privity of contract between Plaintiff and Defendant. This Court and its predecessor consistently have held that the Government's involvement in a project will not serve to establish an implied-in-fact contract between it and a private party where the Government is not a party to the underlying contract. Korea Dev. Corp., 9 Cl. Ct. at 173 (declining to find an implied-in-fact contract in the absence of privity of contract where the United States Agency for International Development ("USAID") loaned money to a plaintiff but reserved the right to approve the terms of contracts between the plaintiff and its lenders); Penn Towne Builders, Inc. v. United States, 4 Cl. Ct. 677, 684-85 (1984) (finding that the Government's high degree of involvement in supervising and drafting the contract did not create an implied-in-fact contract because the United States was not a party to the contract); Somali Dev. Bank v. United States, 508 F.2d 817, 822 (Ct. Cl. 1974) (holding that no implied-in-fact contract existed between the United States and the plaintiff where USAID authorized a loan to the plaintiff, a development bank, and the plaintiff re-loaned the money on its own terms, but the original loan agreement required USAID approval of projects). Even extensive, de facto control of the contract cannot create a contract where no privity exists. Korea Dev. Corp., 9 Cl. Ct. at 173.

Plaintiff cites no case law in opposition to this rule but attempts to distinguish the cases cited above based on the fact that they all involve the Government's "power of the

-17-

purse." According to Plaintiff, these cases stand for the proposition that the United States may impose conditions upon the use of United States funds without assuming liability on the underlying contracts. In Plaintiff's case, the United States never appropriated funds to cover the cost of the contract. However, this argument hurts, rather than helps, Plaintiff. Nothing in Korea Development Corp. and its progeny suggests that the provision of federal funding for the contracts affected the courts' rulings. If anything, the fact that the United States did not provide funding for the contract at issue here renders Defendant's connection to the contract more tenuous. Plaintiff also attempts to distinguish these cases on the basis that some of the contracts at issue contained express provisions disclaiming the Government's liability, whereas the EFIC contract did not. This factual distinction may be true, but it was not dispositive to the courts' rulings.

Contrary to Plaintiff's assertion, there is no genuine issue of material fact surrounding the PCO's involvement in administering the EFIC contract. Defendant is correct as a matter of law that, absent privity of contract between Plaintiff and Defendant, Plaintiff cannot recover for breach of the express contract. No fact alleging representations made by PCO officials on behalf of the United States can change that statement of the law. Therefore, the Court must grant Defendant's motion to dismiss counts 2 and 3 because no genuine issue of material fact exists, and Plaintiff can prove no set of facts in support of its claim that would entitle it to relief.

<u>Conclusion</u>

Based upon the foregoing, Defendant's motion to dismiss is GRANTED with respect to counts 2 and 3 of Plaintiff's amended complaint and DENIED with respect to counts 1 and 4. Counsel for the parties shall file a joint status report within 30 days, on or before April 15, 2009, setting forth a proposed schedule for further proceedings in this case.

IT IS SO ORDERED.

s/ Thomas C. Wheeler
THOMAS C. WHEELER
Judge